[No. A127853. First Dist., Div. One. Jan. 30, 2012.]

STEVEN BERNARD et al., Plaintiffs and Appellants, v.
CITY OF OAKLAND, Defendant and Respondent;
CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Real
Party in Interest and Respondent.

[No. A127844. First Dist., Div. One. Jan. 30, 2012.]

RICHARD MARTINEZ et al., Plaintiffs and Appellants, v.
CITY OF UNION CITY, Defendant and Respondent;
CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Real
Party in Interest and Respondent.

1556

**COUNSEL**

Wylie, McBride, Platten & Renner, John McBride and Christopher E. Platten for Plaintiffs and Appellants.

Meyers, Nave, Riback, Silver & Wilson and J. Scott Smith for Defendant and Respondent City of Union City.

Vicki A. Laden, Deputy City Attorney, for Defendant and Respondent City of Oakland.

Davis Wright Tremaine and John R. Tate for Defendant and Respondent California Public Employees' Retirement System.

---

**OPINION**

**BANKE, J.—**

## I. INTRODUCTION

Plaintiffs in these cases, retired firefighters or their surviving spouses, contend the City of Oakland and Union City were required to make additional payments toward their health care coverage on January 1, 2007, pursuant to an amendment to the Public Employees' Medical and Hospital Care Act (PEMHCA; Gov. Code, § 22750 et seq.). The cities and the California Public Employees' Retirement System (CalPERS), which administers the PEMHCA, maintain they properly implemented the new formula as of January 1, 2007, resulting in increased payments being made in 2008. The trial court agreed with the cities and CalPERS, denied mandamus relief and dismissed the actions. We affirm.[1]

## II. BACKGROUND

The City of Oakland and Union City are contractually obligated to make health care coverage available to current and retired employees under memoranda of understanding with various unions. The cities provide for such coverage through contracts with CalPERS under the PEMHCA (Gov. Code, § 22750 et seq.).[2] Oakland contracted with CalPERS in 1989, and Union City did so in 2000.

In September 2006, the Legislature amended the PEMHCA and, specifically section 22892, subdivision (c). (Stats. 2006, ch. 862, § 1.) Prior to the amendment, contracting agencies, like the cities, could choose to contribute less toward retirees' health care premiums than toward employees' premiums.

---

[1] Because these two actions involve the same statutory issue, they were heard together in the trial court. We likewise consider the two appeals together and issue one opinion in both cases. (See *Rebney v. Wells Fargo Bank* (1990) 220 Cal.App.3d 1117, 1128 [269 Cal.Rptr. 844].) Pursuant to the California Style Manual (4th ed. 2000) section 6:28[B], petitioners are referred to as plaintiffs.

[2] All further statutory references are to the Government Code unless otherwise indicated.

But such agencies were also required to increase the amounts they paid toward retirees' health care premiums by 5 percent each year, until the amounts paid toward retiree and current employee health care premiums were equal. (Former § 22892, subd. (c).) The September 2006 amendment to section 22892, subdivision (c), modified the formula used in the "catchup" provision. Contracting agencies now must annually increase the contribution toward retiree health care premiums by "an amount not less than the number of years that the contracting agency has been subject to this subdivision multiplied by 5 percent of the current monthly employer contribution for employees," but not to exceed $100 annually. (§ 22892, subd. (c).) The amendment was not passed as urgency legislation, and thus became effective January 1, 2007. (Cal. Const., art. IV, § 8, subd. (c), par. (1).)

CalPERS issued two circular letters to contracting agencies about the new statutory provision, explaining the new catchup formula should be applied during 2007 to calculate contributions to health care premiums, resulting in additional payments being made at "the beginning of 2008." Pursuant to the circular letters, the City of Oakland and Union City applied the new formula in their 2007 calculations to determine the amount they would contribute to retiree health care premiums and began paying the increased catchup amounts on January 1, 2008.

Plaintiffs filed these actions seeking writs of mandamus under Code of Civil Procedure section 1085 and other relief on January 2, 2008 (City of Oakland), and March 3, 2008 (Union City). They asserted the cities should have begun paying the increased amounts called for by the amended language on January 1, 2007, rather than on January 1, 2008. The trial court denied the petitions and dismissed the actions by written order dated January 11, 2010.[3]

## III.   DISCUSSION

### A.   Standard of Review

"A traditional writ of mandate under Code of Civil Procedure section 1085 is a method for compelling a public entity to perform a legal and usually ministerial duty. [Citation.] The trial court reviews an administrative action

---

[3] An order denying a petition for writ of mandamus and dismissing the action is considered an appealable judgment. (See *Agosto v. Board of Trustees of Grossmont-Cuyamaca Community College Dist.* (2010) 189 Cal.App.4th 330, 335, fn. 3 [118 Cal.Rptr.3d 300] (*Agosto*) [appeal proper from trial court's written order denying writ petition]; *Public Defenders' Organization v. County of Riverside* (2003) 106 Cal.App.4th 1403, 1409 [132 Cal.Rptr.2d 81].) Similarly, a written, signed order dismissing a complaint is treated as an appealable judgment. (Code Civ. Proc., § 581d; see *Cano v. Glover* (2006) 143 Cal.App.4th 326, 328 [48 Cal.Rptr.3d 871].) Plaintiffs filed timely notices of appeal from the trial court's denial orders.

pursuant to Code of Civil Procedure section 1085 to determine whether the agency's action was arbitrary, capricious, or entirely lacking in evidentiary support, contrary to established public policy, unlawful, procedurally unfair, or whether the agency failed to follow the procedure and give the notices the law requires." (*Klajic v. Castaic Lake Water Agency* (2001) 90 Cal.App.4th 987, 995 [109 Cal.Rptr.2d 454], fn. omitted; accord, *Shelden v. Marin County Employees' Retirement Assn.* (2010) 189 Cal.App.4th 458, 463 [116 Cal.Rptr.3d 883] (*Shelden*).) The court reviews legal questions, including questions of statutory construction, de novo. (See *Shelden, supra*, at p. 463; *Clovis Unified School Dist. v. Chiang* (2010) 188 Cal.App.4th 794, 798 [116 Cal.Rptr.3d 33].)

Appellate review in an ordinary mandamus proceeding " 'is ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial evidence.' " (*Agosto, supra,* 189 Cal.App.4th at p. 336, quoting *Saathoff v. City of San Diego* (1995) 35 Cal.App.4th 697, 700 [41 Cal.Rptr.2d 352].) However, a Court of Appeal engages in de novo review " 'when the case involves resolution of questions of law where the facts are undisputed.' " (*Agosto*, at p. 336, quoting *Saathoff*, at p. 700; accord, *Schram Construction, Inc. v. Regents of University of California* (2010) 187 Cal.App.4th 1040, 1051–1052 [114 Cal.Rptr.3d 680].) Accordingly, we review de novo the question of statutory construction presented in this case.[4] (See *Margarito v. State Athletic Com.* (2010) 189 Cal.App.4th 159, 166 [116 Cal.Rptr.3d 888]; *Farahani v. San Diego Community College Dist.* (2009) 175 Cal.App.4th 1486, 1491 [96 Cal.Rptr.3d 900].)

## B. *Overview of the PEMHCA*

The purpose of the PEMHCA is to "[e]nable the state to attract and retain qualified employees by providing health benefit plans similar to those commonly provided in private industry" and to "[p]romote increased economy and efficiency." (§ 22751, subds. (b), (a).) To this end, the board of administration of CalPERS (CalPERS Board) "shall, in accordance with this part, approve health benefit plans, and may contract with carriers offering health benefit plans" for employees and annuitants. (§ 22793; see § 22850.) An "annuitant" is defined as "(a) A person . . . who has retired within 120 days of separation from employment and who receives a retirement allowance under any state or University of California retirement system to which the state was a contributing party." (§ 22760.) State agencies and local governments may choose to become "contracting agencies" and contract with

---

[4] Although principally styled as mandamus proceedings, to the extent plaintiffs asserted other civil claims, e.g., for breach of contract, we likewise exercise de novo review of the statutory construction issue underlying these claims. (See *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311 [93 Cal.Rptr.3d 559, 207 P.3d 20].)

CalPERS to obtain health benefit plans for their current employees and annuitants. (§§ 20022, 22768, 22850, subd. (f)(2), 22922.)

If an agency chooses to contract with CalPERS, it must contribute an equal amount to the health care premiums of current employees and annuitants, subject to certain minimum contributions. Section 22892, subdivision (b)(1), thus provides in pertinent part: "The employer contribution shall be an equal amount for both employees and annuitants, but may not be less than the following: [¶] . . . [¶] (E) During calendar year 2007, eighty dollars and eighty cents ($80.80) per month. [¶] (F) During calendar year 2008, ninety-seven dollars ($97) per month." (§ 22892, subd. (b)(1)(E)–(F).)

■ There is one exception to the equal contribution mandate—spelled out in section 22892, subdivision (c). This subdivision permits contracting agencies to contribute a lesser amount to the health care premiums of annuitants, subject to the previously referenced catchup provision, intended to eventually equalize premium contributions for annuitants and current employees. (§ 22892, subd. (c).) It is this catchup provision that is at issue here. As we noted above, this provision was amended in September 2006, and the new statutory language became effective January 1, 2007. (§ 22892, subd. (c); Cal. Const., art. IV, § 8, subd. (c), par. (1).)

Both the Bernard and Martinez plaintiffs maintain the amendment required contracting agencies to begin paying the increased premium contributions called for by the new catchup formula on January 1, 2007, the effective date of the amendment. The Martinez plaintiffs additionally contend the minimum contribution requirements of section 22892, subdivision (b), apply even when a contracting agency elects to make contributions for annuitants under section 22892, subdivision (c). All plaintiffs further assert the trial court erred in overruling objections to the declaration of John Rice, chief of operations of health care benefits for CalPERS.

C. *The Statutory Language*

■ "Under well-established rules of statutory construction, we must ascertain the intent of the drafters so as to effectuate the purpose of the law. (*Preston v. State Bd. of Equalization* (2001) 25 Cal.4th 197, 213 [105 Cal.Rptr.2d 407, 19 P.3d 1148].) Because the statutory language is generally the most reliable indicator of legislative intent, we first examine the words themselves, giving them their usual and ordinary meaning and construing them in context. (*People v. Lawrence* (2000) 24 Cal.4th 219, 230 [99 Cal.Rptr.2d 570, 6 P.3d 228].) When statutory language is clear and unambiguous, ' "there is no need for construction and courts should not indulge in it." ' (*People v. Benson* (1998) 18 Cal.4th 24, 30 [74 Cal.Rptr.2d 294, 954 P.2d

557], quoting *People v. Overstreet* (1986) 42 Cal.3d 891, 895 [231 Cal.Rptr. 213, 726 P.2d 1288].)" (*Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 268 [121 Cal.Rptr.2d 203, 47 P.3d 1069].)[5] Thus, if the language is unambiguous, the plain meaning governs and it is unnecessary to resort to extrinsic sources to determine legislative intent. (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 919 [129 Cal.Rptr.2d 811, 62 P.3d 54].)

We therefore turn to the language of the statute. Section 22892 now states in relevant part: "(b)(1) The employer contribution shall be an equal amount for both employees and annuitants, but may not be less than the following: [¶] . . . [¶] (E) During calendar year 2007, eighty dollars and eighty cents ($80.80) per month. [¶] (F) During calendar year 2008, ninety-seven dollars ($97) per month. [¶] . . . [¶] (c) A contracting agency may, notwithstanding the equal contribution requirement of subdivision (b), establish a lesser monthly employer contribution for annuitants than for employees, provided that the monthly contribution for annuitants is annually increased to equal an amount not less than the number of years that the contracting agency has been subject to this subdivision multiplied by 5 percent of the current monthly employer contribution for employees, until the time that the employer contribution for annuitants equals the employer contribution paid for employees. This annual adjustment to the minimum monthly employer contribution for an annuitant as authorized by this subdivision shall not exceed one hundred dollars ($100). . . ." (§ 22892, subds. (b)(1)(E)–(F), (c).)

Plaintiffs assert this statutory language, and in particular the language of section 22892, subdivision (c), is unambiguous and required contracting agencies to begin paying—on January 1, 2007 (the effective date of the statute)—the increased contributions to annuitant health care premiums specified under the modified catchup formula.

CalPERS and the responding cities disagree. They point out the amendment simply modified the formula to be used, and is silent as to how it is to be implemented, except providing that an adjustment is to be made "annually." Respondents therefore maintain a reasonable construction of the statutory language allowed for "application of the amended formula during the course of [the] 2007" premium calculations, resulting in payment of the recalculated amounts beginning January 1, 2008.

The trial court concluded the new statutory language was ambiguous, observing it "did not expressly require [respondents] to make that annual

---

[5] Superseded by statute on another ground as stated in *Alch v. Superior Court* (2004) 122 Cal.App.4th 339, 396–397 [19 Cal.Rptr.3d 25].

adjustment on January 1, 2007, rather than, as [they] did in practice, during the mid-2007 enrollment and election period for calendar year 2008."

■    We agree the amended provision does not address the timing issue raised here and both parties offer plausible readings of the statutory language. We therefore turn to other construction aids to resolve the issue before us, "including the objects to be achieved, the evils to be remedied, legislative history, the statutory scheme of which the statute is a part, contemporaneous administrative construction, and questions of public policy." (*Moran v. Murtaugh Miller Meyer & Nelson, LLP* (2007) 40 Cal.4th 780, 783 [55 Cal.Rptr.3d 112, 152 P.3d 416].)

D.    *The Legislative History*

We first examine the legislative history of the relevant provisions of the PEMHCA. Prior to 1985, the PEMHCA required state employers and contracting agencies to make equal contributions to the health care premiums of current employees and annuitants. (Former § 22810.) However, this "annuitant cost requirement [was] . . . a major factor causing local agency nonparticipation" in the PEMHCA. (Sen. Public Employees and Retirement Com., Analysis of Assembly Bill No. 529 (1985–1986 Reg. Sess.) July 12, 1985, p. 10.)[6]

Accordingly, in 1985, the Legislature added section 22857, to allow contracting agencies to "establish a lesser monthly employer contribution for annuitants than for employees, provided that the monthly contribution for annuitants shall be annually increased by an amount not less than 5 percent of the monthly employer contribution for employees, until the time that the employer contribution for annuitants equals the employer contribution paid for employees." (Former § 22857, subd. (b).) It was contemplated the minimum, 5 percent annual catchup provision would, after 20 years, result in equal contributions to employee and annuitant health care premiums. (Sen. Public Employees and Retirement Com., Analysis of Assem. Bill No. 529 (1985–1986 Reg. Sess.) July 12, 1985, p. 10.)

Seven years later, in 2002, the Legislature again amended the PEMHCA, this time to provide a schedule for annual increases to contributions made toward annuitant health care premiums. (Former § 22825, subd. (b).) The Legislature found: "(a) Retired public employees live on fixed incomes that have eroded significantly over the last several years due to inflation. [¶] (b) In order to meet basic day-to-day living essentials, retirees depend on supplemental benefits, such as health care coverage . . . . [¶] . . . [¶] (g) With high

---

[6] Having complied with Evidence Code sections 455, subdivision (a), and 459, subdivisions (a) and (c), we take judicial notice of portions of the legislative history of the PEMHCA.

medical inflation rates, subsequent health care premium increases and a restricted 2 percent annual inflationary cap on CalPERS pensions, retiree medical costs over time consume, and in some cases exceed, a retired member's pension allowance . . . ." (Stats. 2002, ch. 896, § 1, pp. 5550–5551; see former § 22825.) Thus, it was "the intent of the Legislature to increase the existing minimum employer paid PEMHCA contribution, adjusting it annually for future inflation." (Stats. 2002, ch. 896, § 1, p. 5551.)

In 2004, the Legislature enacted legislation reorganizing and recodifying the PEMHCA. (Stats. 2004, ch. 69, pp. 363–435.) Former sections 22825 and 22857 were repealed, and current section 22892 was enacted in their place. Thus, section 22892 continues the schedule for annual increases in minimum contributions set forth in former section 22825, and also continues the lower contributions for annuitants and catchup formula set forth in former section 22857. (Former § 22892, subds. (b)–(c).) The Legislature intended only to reorganize the statutory provisions, not to alter their substance: "It is the intent of the Legislature in enacting this act to reorganize the Public Employees' Medical and Hospital Care Act and the State Employees' Dental Care Act. It is not the intent of the Legislature to make any substantive change in the law. Thus, if, in the opinion of any court . . . a different result under any provision of [the PEMHCA] . . . would occur because of enactment of this act, the provision as it read on the effective date of this act shall be followed and the result shall be as it would have been on that date. It is further the intent of the Legislature that no new or additional rights vest in any employee, annuitant, or family member nor any benefits be reduced or impaired as a result of the enactment of this act. . . ."[7] (Sen. Bill No. 626 (2003–2004 Reg. Sess.) § 40.)

Three years later, in 2007, the Legislature amended section 22892, modifying the catchup provision to include the language at issue here. The bill analysis of the Assembly Committee on Public Employees, Retirement and Social Security explained the amendment was necessary because, "[i]n practice," the existing provision "never results in an employer-paid retiree health care contribution that equals the employer-paid active contribution because health care premium rates historically increase at a rate that far exceeds 5% per annum." (Assem. Com. on Public Employees, Retirement and Social Security, Analysis of Assem. Bill No. 2544 (2005–2006 Reg. Sess.) as introduced Feb. 23, 2006, pp. 1–2.) The bill analysis of the Senate Public Employment and Retirement Committee similarly summarized the

---

[7] Although this is an uncodified section of the enacted legislation, it has the same force and effect as its codified sections. (*County of Los Angeles v. Payne* (1937) 8 Cal.2d 563, 574 [66 P.2d 658] ["The codes of this state . . . have no higher standing or sanctity than any other statute regularly passed by the [L]egislature."]; see also *Grinzi v. San Diego Hospice Corp.* (2004) 120 Cal.App.4th 72, 86 [14 Cal.Rptr.3d 893].)

argument in support of the legislation: " 'Given escalating, uncapped health benefit costs, it is nearly impossible for retirees of PEMHCA contracting employers to earn an employer-paid active health care contribution in a 20-year period. Therefore, affected retirees are denied the public policy protection of equal treatment for retirees under the law that PEMHCA was created to provide.' " (Sen. Public Employees and Retirement Com., Rep. on Assem. Bill No. 2544 (2005–2006 Reg. Sess.) as amended June 13, 2006, p. 2.) The purpose of the amendment was thus to " 'ensure that PEMHCA participating employers are indeed able to contribute equally on behalf of their active and retired employees within a 20-year period, as intended, for their health care coverage.' " (Assem. 3d reading analysis of Assem. Bill No. 2544 (2005–2006 Reg. Sess.) as introduced Feb. 23, 2006, p. 2.)

As initially introduced, the legislation provided in relevant part: "A contracting agency may, notwithstanding the equal contribution requirement of subdivision (b), establish a lesser monthly employer contribution for annuitants than for employees, provided that the monthly contribution for annuitants . . . equals an amount not less than the number of years that the contracting agency has been subject to this subdivision multiplied by 5 percent of the current monthly employer contribution for employees, until the time that the employer contribution for annuitants equals the employer contribution paid for employees. . . ." (Assem. Bill No. 2544 (2005–2006 Reg. Sess.) § 1, as introduced Feb. 23, 2006, italics omitted.) The final version of the bill included an additional provision that the "annual adjustment to the minimum monthly employer contribution for an annuitant as authorized by this subdivision shall not exceed one hundred dollars ($100) . . . ." (Assem. Bill No. 2544 (2005–2006 Reg. Sess.) § 1, as amended Aug. 15, 2006, italics omitted.) This "technical amendment[], taken by the author at the request of PERS, clarif[ied] that the increase in the employer PEMHCA contribution may occur only once annually, and cannot exceed $100." (Sen. Public Employees and Retirement Com., Analysis of Sen. Floor Amend. to Assem. Bill No. 2544 (2005–2006 Reg. Sess.) as amended Aug. 15, 2006, p. 1.)

The legislative history thus indicates that in modifying the catchup provision of section 22892, subdivision (c), the Legislature was putting into place a formula that would achieve parity in health care premium contributions for current employees and retirees over the course of two decades. It also indicates intent that contracting agencies be subject to no more than an annual increase in premium contributions, and by no more than $100. Thus, the legislative history reflects a measured and incremental approach to the issue. It does not, however, speak directly to how the revised catchup formula would be implemented or when the first payment of increased contributions would be made.

E.  *Administrative Interpretation*

██    We next examine the administrative actions of CalPERS. "[W]hen a statute is susceptible of more than one interpretation, we will consider an administrative interpretation of the statute that is reasonably contemporaneous with its adoption." (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1011–1012 [32 Cal.Rptr.3d 89, 116 P.3d 550].) " 'Although not necessarily controlling . . . the contemporaneous administrative construction of [an] enactment by those charged with its enforcement . . . is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized.' " (*People ex. rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 309 [58 Cal.Rptr.2d 855, 926 P.2d 1042], quoting *Coca-Cola Co. v. State Bd. of Equalization* (1945) 25 Cal.2d 918, 921 [156 P.2d 1].)

The PEMHCA specifies the CalPERS Board has "all powers reasonably necessary to carry out the authority and responsibilities expressly granted or imposed upon it . . . ." (§ 22794.) It further provides the Board may "make such rules as it deems proper," and shall "adopt all necessary rules and regulations to carry out the provisions of this part including, but not limited to, any of the following: [¶] (1) Regulations establishing the following: [¶] (A) The scope and content of a basic health benefit plan. [¶] (B) Reasonable minimum standards for health benefit plans. [¶] (C) The time, manner, method, and procedures for determining whether approval of a health benefit plan should be withdrawn. [¶] (2) Regulations pertaining to any other matters that the board may be expressly authorized or required to provide for by rule or regulation by the provisions of this part." (§§ 20121, 22796, subd. (a).) Accordingly, while CalPERS's construction of the statutory language at issue is not binding, as the administrative body charged with implementing the act, its interpretation is entitled to deference.

██    As we have observed, CalPERS issued two circular letters to contracting agencies to provide guidance about the effect and requirements of the amended statutory language. Circular letters are commonly used by administrative agencies to communicate their understanding of the statutes with which they are charged with administering. (See *Hudson v. Board of Administration* (1997) 59 Cal.App.4th 1310, 1325–1326 [69 Cal.Rptr.2d 737]; *City of Sacramento v. Public Employees Retirement System* (1991) 229 Cal.App.3d 1470, 1476–1477 [280 Cal.Rptr. 847].)

Plaintiffs contend CalPERS had no authority to issue these circular letters without complying with the formal notice and hearing procedures of the Administrative Procedure Act (APA; Gov. Code, § 11340 et seq.). They are incorrect. Circular letters are not formal regulations which must be adopted

through the APA process. Moreover, it is well established that an agency's "adoption of an interpretation consistent with the language and intention of a law and existing regulations as a prelude to enforcement does not require compliance with the APA." (*Modesto City Schools v. Education Audits Appeal Panel* (2004) 123 Cal.App.4th 1365, 1382 [20 Cal.Rptr.3d 831].) However, when not adopted as a formal regulation, an agency's interpretation of statutory language is entitled to less deference. (See *Culligan Water Conditioning v. State Bd. of Equalization* (1976) 17 Cal.3d 86, 92 [130 Cal.Rptr. 321, 550 P.2d 593]; *Mackey v. Bristol West Ins. Service of Cal., Inc.* (2003) 105 Cal.App.4th 1247, 1263 [130 Cal.Rptr.2d 536] [agency interpretation in informational booklet entitled to less weight than formal regulation].)

CalPERS's first circular letter, dated March 21, 2007, discussed the change in the catchup formula. It stated in pertinent part: "The purpose of this Circular Letter is to inform you about new legislation which will impact computations for agencies contracting for CalPERS Health Benefits under [the PEMHCA]. These changes affect only those contracting agency employers who utilize the 'unequal contribution' method for health care premium payments for retirees. [¶] . . . [¶] Assembly Bill 2544 . . . changes this computation for annual increases to annuitant health care under the unequal method. Under the new provisions, agencies will have to annually increase the total monthly annuitant health care contribution to equal an amount not less than the number of years the agency has been in the PEMHCA program, multiplied by 5 percent of the current monthly employer contribution for employees, until the time that the employer contribution for annuitants equals the employer contribution paid for employees. This annual adjustment to the minimum monthly employer contribution for an annuitant authorized by this change cannot exceed one hundred dollars ($100) per annuitant per month."

Under the heading "Implementation," the circular letter further explained: "Each June, when the Board announces the results of rate negotiations for the following year, contracting agencies have a 60-day opportunity to review their future year contract. At that time, agencies assess the impact of new rates on their contract and the annual adjustment needed for employer contributions for health care for annuitants. With respect to AB 2544, the required adjustment to annuitant health care contributions will be performed in 2007 for implementation in the beginning of 2008." CalPERS thus summarized the new statutory language as "impact[ing] contract decisions agencies make in 2007 to change employer contributions that are effective January 1, 2008."

CalPERS's second circular letter, dated May 24, 2007, was entitled "Assembly Bill 2544, Calculation Example." The letter provided an exemplar

calculation of a contracting agency's contribution to an annuitant's health care premiums. It also reiterated the information about payment "in the beginning of 2008."

■ Plaintiffs assert CalPERS's interpretation of the catchup provision is contrary to the statutory language, and thus maintain the circular letters should be disregarded because CalPERS had no authority "to effect a delay in implementation of the amendment for one year."

■ As we have explained, however, we do not agree the statutory language is clear and unambiguous. CalPERS's interpretation is not in conflict with the amended language. Nor is it an unreasonable construction of the language. It is also consistent with the Legislature's measured and incremental approach to achieving parity in premium contributions for current employees and retirees. We therefore give due deference to the circular letters, and conclude this is an appropriate case to defer to CalPERS's interpretation of the statutory language in dispute. "[W]hile interpretation of a statute or regulation is ultimately a question of law, we must also defer to an administrative agency's interpretation of a statute or regulation involving its area of expertise, unless the interpretation flies in the face of the clear language and purpose of the interpreted provision." (*Communities for a Better Environment v. State Water Resources Control Bd.* (2003) 109 Cal.App.4th 1089, 1104 [1 Cal.Rptr.3d 76].)

### F. Consequences of Differing Interpretation

■ The cities and CalPERS also amply demonstrated the significant practical difficulties that would result if the amended language were interpreted as urged by plaintiffs. Where more than one statutory construction is arguably possible, our " ' "policy has long been to favor the construction that leads to the more reasonable result" ' " (*Witt Home Ranch, Inc. v. County of Sonoma* (2008) 165 Cal.App.4th 543, 555 [81 Cal.Rptr.3d 123]), considering " ' "the consequences that will flow from a particular interpretation" ' " (*Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278, 290 [64 Cal.Rptr.3d 661, 165 P.3d 462]) and avoiding a construction that would "lead to unreasonable, impractical or arbitrary results" (*ibid.*).

In the trial court, CalPERS submitted the declaration of John Rice, chief of operations of health care benefits since 2007. Rice drafted the circular letters for Holly Fong, chief of the office of employer and member health services. In addition to providing foundational information about the circular letters, Rice also discussed the process and annual timeline by which CalPERS administers the PEMHCA health care benefit program and why that process

and timeline effectively precluded contracting agencies from paying contributions to annuitants' health care premiums under the new catchup formula on January 1, 2007.

Rice explained that each year, CalPERS negotiates with health care plans about the benefits to be offered and the premiums to be charged. These negotiations "must be completed in the Spring of each year so that proposed changes can be submitted to the CalPERS Board in June of each year." The board then approves a final benefit package and relays it to "all eligible public agencies for action." After the premiums for PEMHCA benefits are announced by CalPERS, a contracting agency can choose to withdraw from the PEMHCA, and, if it does so, it must notify the board within 60 days of the announcement of the health plan premium rates for the following benefit year. (Cal. Code Regs., tit. 2, § 599.515, subd. (e).) Given the timing of the annual contracting process, which results in the announcement of plan benefits and premiums each year in June, notices of withdrawal must be received by CalPERS in August. Contracting agencies then hold open enrollment periods in September and/or October, during which employees and annuitants select their health benefit plans for the upcoming year. In December, CalPERS mails invoices to contracting agencies "for the aggregate amount of the agency's employer contribution toward the PEMHCA premium."

Rice further explained "[e]ach of these steps is necessary to the administration of PEMHCA and the fulfillment of its purpose. Consequently, these steps do not vary significantly from year to year." The contracting and enrollment process for 2006 was thus "typical of prior years." During the first half of the year, CalPERS negotiated the benefits and premiums of the health care plans to be offered in 2007. The board approved the changes in benefits and premiums on June 21, 2006, starting the 60-day period in which contracting agencies were permitted to terminate their participation in the PEMHCA. That period ended on August 20, 2006, and contracting agencies then held open enrollment from September 1 through September 29. CalPERS sent invoices to the contracting agencies in December for their premium contributions for the 2007 benefit year, payable in January 2007.

Thus, when the legislation modifying the catchup provision was signed by the Governor on September 30, 2006, the contribution rates for the upcoming 2007 benefit year had already been determined for over 300 contracting agencies under the prior catchup formula, the agencies had already determined whether or not to terminate participation, and open enrollment had closed. Accordingly, "the premature application of the revised formula for unequal contributions in January of 2007 would have been enormously disruptive and would have entailed repetition of the annual contracting and enrollment process from the point of announcement of new premiums . . . . It

would also have required a new open enrollment period to allow annuitants to revisit their benefit plan selections and further administrative steps to collect, input, and process the new enrollment and billing information."

The cities agreed with Rice's assessment of the consequences of interpreting the amended language as urged by plaintiffs and contrary to that adopted by CalPERS. Yvonne Hudson, human resource manager for the City of Oakland, stated "After receiving rates from PERS in June, the City is allowed a 60-day period in which to review the new rates and decide whether to opt out of PERS. The City routinely receives preliminary information concerning the June rates in May. In 2006, the City relied on the rates quoted by CalPERS and the formula for computing the increase in unequal contributions contained in Government Code section 22892(c) as it existed at that time. Based on that information the City did not withdraw from PEMHCA for the upcoming benefit year. [¶] . . . Were rates to increase off cycle, the City would be unable to exercise its ability to opt out of PERS during the 60 day period."

Diane Morimune, supervising personnel analyst for Union City, likewise declared "The contract with CalPERS indicates both the health plan rates and the cost to the City for the health plans each year. The City is informed by CalPERS by June of each year about the premium rates for its health plans for the next calendar year. The City then is allowed a 60-day period in which to review the next year's contract with CalPERS and assess the impact of the new rates on its contract with CalPERS . . . . If the City chooses to opt out of the CalPERS plans for the next calendar year, it may only do so during this 60-day period. . . . [¶] . . . [¶] If the amount of the City's contributions for health plan premiums for annuitants had been increased, based on AB 2544's new calculation methodology, effective as of January 1, 2007, . . . [t]he terms of the contract [with CalPERS] would have been altered without the parties['] agreement."[8]

It is also "a settled principle of statutory construction that a Legislature in legislating with regard to an industry or an activity, must be regarded as having had in mind the actual conditions to which the act will apply; that is, the customs and usages of such industry or activity." (*Irvine Co. v. California Emp. Com.* (1946) 27 Cal.2d 570, 581 [165 P.2d 908].) Thus, the " ' "Legislature is presumed to be aware of a long-standing administrative practice . . . ." ' " (*County of San Diego v. Brown* (1993) 19 Cal.App.4th 1054, 1079, fn. 33 [23 Cal.Rptr.2d 819], quoting *Thornton v. Carlson* (1992) 4 Cal.App.4th 1249, 1257 [6 Cal.Rptr.2d 375].)

---

[8] Plaintiffs' objections to portions of the Morimune and Hudson declarations were sustained in part and overruled in part. Plaintiffs do not challenge any of the adverse evidentiary rulings on appeal.

Although plaintiffs principally assert the amended language is unambiguous and therefore legislative history and administrative interpretation and application should be ignored, they also contend the trial court erred in overruling objections to portions of Rice's declaration. Plaintiffs claim Rice failed to provide sufficient information to testify as an expert under Evidence Code section 801 or to testify as a percipient witness about CalPERS health care plan procurement practices.[9] Evidence Code section 801 sets forth the foundational requirements for expert testimony. "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] . . . [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion . . . ." (Evid. Code, § 801, subd. (b).) We review the trial court's evidentiary rulings for abuse of discretion. (See *People v. Castaneda* (2011) 51 Cal.4th 1292, 1336 [127 Cal.Rptr.3d 200, 254 P.3d 249].)

Rice's declaration demonstrated he had extensive experience and was personally involved in the administration and implementation of the PEMHCA.[10]

---

[9] Plaintiffs objected to the following statements in Rice's declaration: (1) "Repetition of these steps over a period of years has created a degree of predictability which is an important consideration for public agencies in their annual budget process and labor negotiations." (2) "By refraining from terminating participation or by joining PEMHCA in reliance on announced premiums and the existing statutory formula, contracting agencies had become bound to pay the unequal contribution amounts required by the statute at that time and incorporated those changes into their budgets." (3) "Those agencies then determined whether to terminate their participation in PEMHCA after their unequal contribution obligations were calculated using the formula in . . . section 22892(c), as amended by AB 2544." (4) "The Legislature, by its representation on and participation in the CalPERS Board, was aware of the process in place for rate negotiation and the impact of those negotiations on public agency employees. This clarity was demonstrated in 2003 through the Board's decision on, and passage of, emergency regulations establishing the process for agencies to have 60 days in which to review new rates and make a determination as to whether they would remain in the [PEMHCA] program." (5) "This would have required not only the recalculation of the unequal contribution amounts for each affected agency, but also budgetary procedures at each of the contracting agencies to authorize the further increases. It would also have required a new open enrollment period to allow annuitants to revisit their benefit plan selection and further administrative steps to collect, input, and process the new enrollment and billing information."

[10] Rice declared: "I have been employed by [CalPERS] in the Health Benefits Branch for approximately twelve years. I am currently Chief of Operations of the Health Benefits Branch, a position I have held since 2007. My present responsibilities include personnel, administrative support functions, legislation, and budgets. Prior to my current position I served as Chief of Enrollment Functions, Assistant Chief of the Employer-Member Health Services Division, and was responsible for the Public Agency Program. As a result, I have been involved in CalPERS' activities in contracting with healthcare plans and providers as well as the administration and coordination of health benefits with participating public agencies under the [PEMHCA]. As part of my responsibilities, I personally participated in CalPERS' review and implementation

He "personally participated in CalPERS' review and implementation of AB 2544," and authored the circular letters. Thus, not only was there a sufficient foundation for his expert opinion on that topic, there was also a sufficient foundation for him to testify as to his personal knowledge of the procedures and practices employed by CalPERS in administering the PEMHCA. (See Evid. Code, § 702.) We find no abuse of discretion in admitting the contested statements. And even if there was error, it was harmless. Hudson's and Morimune's declarations supplied much of the same information, and even without these or Rice's declarations, we would, for the reasons discussed above, defer to CalPERS's administrative interpretation of the challenged statutory language set forth in its circular letters.

G. *Minimum Contribution Requirements of Section 22892, Subdivision (b)(1)*

The Martinez plaintiffs additionally contend the minimum contribution amounts set forth in section 22892, subdivision (b), apply even though Union City has elected to make contributions to health care premiums for employees and annuitants under section 22892, subdivision (c). Specifically, they claim Union City was required to pay the minimum contributions set forth in section 22892, subdivision (b)(1)(E) and (F), of $80.80 per month in 2007 and $97 per month in 2008, notwithstanding the city's election to make increasing contributions as specified under section 22892, subdivision (c).

Subdivision (b) of section 22892 states in relevant part: "The employer contribution shall be an equal amount for both employees and annuitants, but may not be less than the following: [¶] . . . [¶] (E) During calendar year 2007, . . . ($80.80) per month. [¶] (F) During calendar year 2008, . . . ($97) per month." (§ 22892, subd. (b)(1)(E)–(F).) Subdivision (c) of section 22892 states in pertinent part: "A contracting agency may, *notwithstanding the equal contribution requirement of subdivision (b),* establish a lesser monthly employer contribution for annuitants than for employees . . . ." (§ 22892, subd. (c), italics added.)

■ The Martinez plaintiffs point out that the "notwithstanding" proviso makes reference only to the *"equal contribution requirement* of subdivision (b)." They therefore contend the plain language of the proviso leaves intact section 22892, subdivision (b)'s *minimum contribution* requirements.

of AB 2544." "I wrote Circular Letter 600-012-07, which was sent to all contracting agencies under the signature of Holly A. Fong, Chief, Office of Employer and Member Services . . . . [¶] I subsequently authored Circular Letter 600-029-07, intended to provide contracting agencies affected by the amendment to section 22892(c) with more guidance on the computation of their unequal contribution obligation . . . ."

CalPERS maintains the "notwithstanding" proviso of section 22892, subdivision (c) makes clear subdivision (c) is an *alternative* to subdivision (b). We agree.

■ First, section 22892, subdivision (c) contains its own formula for determining the amount of premium contributions, and further specifies annual increases cannot exceed $100 per annuitant. (§ 22892, subd. (c).) Had the Legislature intended to also require specific minimum contribution amounts, as it did in section 22892, subdivision (b), it certainly could have said so. It did not, and it is not our role to read into the statutory language the Legislature chose not to include. (See Code Civ. Proc., § 1858; see also *Security Pacific National Bank v. Wozab* (1990) 51 Cal.3d 991, 998 [275 Cal.Rptr. 201, 800 P.2d 557].)

Second, this construction is required by the uncodified by provisions of the legislation reorganizing the PEMHCA in 2004. As we have discussed, prior to this reorganization, the provisions now set forth in section 22892 were set forth in former sections 22825 and 22857. Former section 22825 contained the provisions of current section 22892, subdivision (b), providing for equal employer contributions on behalf of annuitants and employees subject to specified minimum contribution amounts for each calendar year. (Former § 22825.) Former section 2285757 contained the provisions of current section 22892, subdivision (c), and provided a contracting agency "[m]ay, *notwithstanding Section 22825*, establish a lesser monthly employer contribution for annuitants than for employees . . . ." (Former § 22857, subd. (b), italics added.) Thus, prior to 2004, the PEMHCA in former section 22825 generally required equal contributions on behalf of employees and annuitants, subject to specified minimums. But "notwithstanding Section 22825," a contracting agency could under former section 22857 "establish a lesser monthly contribution for annuitants than for employees" subject to a catchup formula. Accordingly, two different statutes provided two distinctly different choices for contracting agencies.

The Martinez plaintiffs essentially claim the change in language from the "notwithstanding Section 22825" in former section 22857, to the "notwithstanding the equal contribution requirement of subdivision (b)" in current section 22892, subdivision (c), effected a substantive change and created overlap in the formerly separate statutory provisions. However, the Legislature stated explicitly the recodification of the PEMHCA did not "make any substantive change in the law. . . . [N]o new or additional rights vest in any employee, annuitant, or family member nor any benefits be reduced or impaired as a result of the enactment of this act." (Sen. Bill No. 626 (2003–2004 Reg. Sess.) § 40.)

▆▆▆ Accordingly, there is no merit to the Martinez plaintiffs' assertion that a contracting agency that elects to proceed under subdivision (c) of section 22892 must also comply with the minimum contribution provisions of section 22892, subdivision (b).

## IV. DISPOSITION

The orders denying plaintiffs' writ petitions and orders/judgments of dismissal are affirmed.

Marchiano, P. J., and Margulies, J., concurred.