Filed 5/8/15

**CERTIFIED FOR PARTIAL PUBLICATION**\*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ROBERT MARZEC et al. | B246667 (consolidated with B246671) |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. Nos. BC461887, BC480695) |
| v. | |
| CALIFORNIA PUBLIC EMPLOYEES RETIREMENT SYSTEM et al., | |
| Defendants and Respondents. | |

 

APPEALS from judgments of the Superior Court of Los Angeles County, Anthony Mohr, Judge. Affirmed in part and reversed in part.

Law Offices of John Michael Jensen and John Michael Jensen, for Plaintiff and Appellant.

Steptoe & Johnson LLP, Edward Gregory and Jason Levin, for Defendants and Respondents.

———————————————

**\*** Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication. The portions of this opinion to be deleted from publication are those portions enclosed within double brackets, **[[ ]]**.

These consolidated appeals concern the calculation of retirement benefits under the Public Employees' Retirement Law (PERL), Government Code section 20000 et seq.[1] The plaintiffs are former police officers and firefighters employed by local public agencies that provide employee retirement benefits through the California Public Employees' Retirement System (CalPERS). In order to enhance their service retirement benefits, plaintiffs purchased additional years of service credit through one of several optional programs offered by CalPERS. Subsequently, each plaintiff was disabled on the job and took an industrial disability retirement before reaching service retirement age. As a result, CalPERS pays each plaintiff a monthly disability retirement allowance of 50 percent of his or her final compensation. CalPERS does *not*, however, pay plaintiffs any additional allowance as a result of their purchase of additional years of service credit.

This appeal involves two putative class actions in which plaintiffs contend that their purchase of additional service credit entitled them to enhanced retirement benefits under the PERL. They alleged CalPERS's failure to pay such enhanced benefits gave rise to a variety of causes of action, including breach of statutory duty, breach of contract, rescission, breach of fiduciary duty, and constitutional claims.[2] In the first action, the trial court sustained CalPERS's demurrer to all causes of action without leave to amend, concluding that plaintiffs had not properly pled an entitlement to the additional retirement benefits they claimed as a matter of statutory, constitutional, or contract law. As to the second action, the trial court granted judgment on the pleadings on the same bases.[3]

---

[1]      All subsequent undesignated statutory references are to the Government Code.

[2]      The two complaints at issue in this appeal assert the same 12 causes of action and are pled in virtually identical language. Thus, although this appeal addresses two different complaints, for ease of reference we refer throughout this opinion to the "complaint" in the singular. Where we quote from a complaint, the quoted language is from the *Marzec* complaint.

[3]      For ease of reference, we refer collectively to CalPERS's demurrer in the first action and its motion for judgment on the pleadings in the second action as "the demurrer."

We affirm in part. As we discuss, neither the PERL nor plaintiffs' contracts entitle plaintiffs to the additional retirement benefits they seek, and thus the causes of action for breach of statutory duty and breach of contract fail as a matter of law. Plaintiffs' causes of action for constitutional torts also fail because, as a matter of law, CalPERS's interpretation of the applicable statutory provisions does not deny plaintiffs due process or equal protection of law and does not effect an unconstitutional impairment of contract.

We reverse, however, as to the causes of action for rescission and breach of fiduciary duty. Plaintiffs allege that CalPERS failed to disclose the potential loss of the value of purchased service credit if plaintiffs suffered a disability—a disclosure that CalPERS, as a fiduciary, is alleged to have been required to make. We conclude that plaintiffs' pleading in this regard is sufficient to survive demurrer, and thus the demurrer should have been overruled as to these causes of action.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### Background

*A. CalPERS Retirement Benefits*

CalPERS is a unit of the Government Operations Agency responsible for administering the retirement systems for the State of California and "contracting agencies"—local public agencies that have "elected to have all or part of [their] employees become members of this system and that ha[ve] contracted with [CalPERS] for that purpose." (§§ 20001, 20002, 20004, 20022, 20028.) All of the plaintiffs in this action worked as police officers or firefighters for local public agencies that enrolled their employees in CalPERS. (§ 20420.)

The PERL authorizes retirement benefits to CalPERS members. As relevant here, the PERL provides safety members employed by local public agencies ("local safety members") with two distinct kinds of retirement benefits:

(1) *Service retirement benefit*: If a member retires at or after age 50, the member is eligible for a service pension to "equal 3 percent of his or her final compensation at retirement, multiplied by the number of years of patrol service or local

3

safety service subject to this section with which he or she is credited at retirement."
(§ 21362.2.)

(2) *Industrial disability retirement benefit*: If a member retires before age 50 because of an industrial (job-related) disability, he or she "shall receive a disability retirement allowance of 50 percent of his or her final compensation." (§ 21413.)[4] Alternatively, the disabled member may "waive[] the right to retire for disability and elect[] to withdraw contributions or to permit contributions to remain in the fund . . . ." (§ 21153.)

B. *Right to Purchase Additional Service Credit*

At all relevant times, CalPERS members who had served with the United States Armed Forces were permitted to receive credit for such service "in addition to his or her current and prior service credit" by "contribut[ing] in a lump sum or by installment payments . . . an amount equal to . . . the contributions he or she would have made to this system for the period for which current service credit is granted." (§ 21032; see also §§ 21020, 21024, 21033.) Such purchased service credit is referred to as "military service credit" (MSC).

Between 2003 and 2012, CalPERS members with at least five years of credited state service were permitted "to make contributions . . . and receive not less than one year, nor more than five years, in one-year increments, of additional retirement service credit in the retirement system." (§ 20909, subd. (a).) To receive such credit, members were required to contribute "an amount equal to the increase in employer liability, using the payrate and other factors affecting liability on the date of the request for costing of the service credit." (§ 21052.) This purchased service credit is referred to as "additional retirement service credit" (ARSC) or "airtime."

---

[4]    Under section 21413, a member who retires for industrial disability after age 50 (i.e., at an age at which the member qualifies for service retirement) receives either a 50 percent disability retirement allowance or his or her service retirement allowance, whichever is greater. Because all plaintiffs retired before age 50, they were not eligible for service retirement benefits.

4

C. *Plaintiffs' Purchases of Additional Service Credit and Subsequent Industrial Disability Retirements*

Each of the plaintiffs purchased additional service credit and subsequently took industrial disability retirement before age 50, as follows:

Plaintiff Robert Marzec worked as a police officer for the Stockton Police Department for approximately 17 years. In 2004, he elected to purchase four years of military service credit based on his previous service with the United States Marines by making a lump sum payment of $23,709. In August 2010, after suffering a job-related injury, Marzec took an industrial disability retirement and began receiving industrial retirement benefits of 50 percent of his final compensation.

Plaintiff Rachel Healy worked as a police officer for the Stockton Police Department for approximately nine years. In 2005, she elected to purchase five years of ARSC by making a lump sum payment of $31,360, and rolling over an additional $46,000 from a deferred compensation account. After she suffered a job-related injury, Healy took an industrial retirement effective September 2009 and began receiving industrial retirement benefits of 50 percent of her final compensation.

Plaintiff Benjamin Esparza worked as a firefighter for the City of Monrovia Fire Department for approximately 25 years. In 2005, he elected to purchase five years of ARSC by rolling over $76,436 from his deferred compensation plan. He was injured on the job and took an industrial disability retirement in August 2009. At that time, he began receiving industrial retirement benefits of 50 percent of his final compensation.

Plaintiff Jeffrey Andert worked as a police officer for the City of Alhambra Police Department for six years. In 2004, he elected to purchase four years of military service credit through bi-weekly installment payments of $269.90, for a total of $77,190 in principal and interest. Andert was injured on the job in 2006, and in 2007 he asked for, and received, permission to suspend his installment payments. Andert took an industrial disability retirement in May 2008 and began receiving industrial retirement benefits of 50 percent of his final compensation. In August 2008, he permanently suspended all further installment payments.

5

Plaintiff Neil MacLaren was a firefighter for the Roseville Fire Department for more than 21 years. In 2005, MacLaren elected to purchase two years of ARSC by rolling over $29,977 from his retirement account. MacLaren was injured on the job and took an industrial disability retirement in 2009, at which time he began receiving industrial disability benefits of 50 percent of his final compensation.

Plaintiff Randy Slaughter was a police officer for the City of Newport Beach Police Department for approximately 17 years. In 2001, Slaughter elected to purchase four years of military service credit by making monthly installment payments of $6,977 and a lump sum payment of $44,652. Slaughter took an industrial disability retirement in 2004, at which time he began receiving industrial retirement benefits of 50 percent of his final compensation.

Because each of the plaintiffs retired before age 50, none received a service retirement benefit, and none received any additional retirement benefits as a result of his or her purchase of MSC or ARSC.

## II.

### The Present Actions

Marzec, Healy, and Esparza filed an action on May 18, 2011 (the *Marzec* action), and filed the operative first amended class action complaint on February 28, 2012. Andert, MacLaren, and Slaughter filed a similar class action complaint (the *Andert* action) on March 12, 2012. Both actions asserted that plaintiffs were entitled, in addition to their industrial disability retirement allowances (sometimes referred to as "IDR"), to additional retirement benefits associated with their purchases of MSC or ARSC. The actions asserted that neither the PERL nor plaintiffs' purchase contracts authorized CalPERS to "seize" plaintiffs' MSC/ARSC investments as a condition of receiving disability benefits, that CalPERS did not adequately advise plaintiffs of this risk of seizure before they invested in MSC or ARSC, and that through its administration of disability and MSC/ARSC benefits, CalPERS treated plaintiffs differently than other similarly situated CalPERS members.

6

Plaintiffs allege that CalPERS's failure to pay additional retirement benefits or to return the MSC or ARSC investments gave rise to 12 causes of action: (1) breach of statutory duties; (2) breach of contract; (3) rescission/ restitution; (4) breach of fiduciary duties; (5) denial of equal protection; (6) denial of due process; (7) equitable relief; (8) declaratory relief; (9) accounting; (10) constitutional impairment of contract; (11) estoppel; and (12) other relief, including attorney fees.

## III.

## CalPERS's Demurrer in the *Marzec* Action

CalPERS demurred to the first amended complaint in the *Marzec* action. In a detailed written opinion, the trial court sustained the demurrer without leave to amend. Although the court said that plaintiffs' situation is "certainly sympathetic," it concluded that none of plaintiffs' causes of action stated a claim for relief. The court entered a judgment of dismissal, and plaintiffs timely appealed.

## IV.

## CalPERS's Motion for Judgment on the Pleadings in the *Andert* Action

CalPERS filed a motion for judgment on the pleadings in the *Andert* action. The motion asserted that plaintiffs' claims were functionally identical to those in the *Marzec* case, and therefore the court should grant judgment on the pleadings for the same reasons it sustained the demurrer in *Marzec*.

The trial court granted the motion for judgment on the pleadings. Plaintiffs timely appealed, and this court ordered the *Marzec* and *Andert* appeals consolidated.

## STANDARD OF REVIEW

A demurrer is properly sustained " 'when the complaint fails to allege facts sufficient to state a cause of action.' " (*People ex rel. Harris v. PAC Anchor Transportation, Inc*. (2014) 59 Cal.4th 772, 777 (*Harris*); *Rope v. Auto-Chlor System of Washington, Inc*. (2013) 220 Cal.App.4th 635, 644.) " 'All properly pleaded, material facts are deemed true, but not contentions, deductions, or conclusions of fact or law. . . .' [Citation.] Courts may consider judicially noticeable matters . . . as well. [Citation.]" (*Harris*, *supra*, at p. 777.) "Because a motion for judgment on the pleadings is the

7

functional equivalent of a general demurrer, the same rules apply." (*Hightower v. Farmers* (1995) 38 Cal.App.4th 853, 858.)

"We review an order sustaining a demurrer de novo, exercising our independent judgment as to whether a cause of action has been stated as a matter of law. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125.) Because a demurrer tests only the legal sufficiency of the pleading, the facts alleged in the pleading are deemed to be true. [Citation.] We do not review the validity of the trial court's reasoning, and therefore will affirm its ruling if it was correct on any theory. (*Ibid.*)" (*Nasrawi v. Buck Consultants LLC* (2014) 231 Cal.App.4th 328, 337.)

## DISCUSSION

### I.

### Breach of Statutory Duty (First Cause of Action)

A. *Preliminary Matters: Plaintiffs' Duty to Identify a Statutory Basis for Their Claim and to Affirmatively Demonstrate Trial Court Error*

Plaintiffs' first cause of action is for breach of statutory duty. Plaintiffs urge that CalPERS has violated California statutory law by "forc[ing] Plaintiffs to involuntarily relinquish all or part of their investment in [MSC and ARSC] which the Plaintiffs contributed for time or service outside their safety employment," and they ask the court to declare that CalPERS failed to pay them all the benefits to which they are entitled. Plaintiffs further ask the court either to "[o]rder CalPERS to pay disabled Plaintiffs a continuing [MSC or ARSC] benefit in addition to Plaintiffs' disability allowance . . . in an amount that provides Plaintiffs the full additional value that CalPERS is obligated to pay under the relevant statutory provisions in the PERL," or in the alternative, to order CalPERS to refund to plaintiffs the sums they paid to purchase MSC or ARSC.

We note as a preliminary matter that although plaintiffs allege breach of a statutory duty—and although the complaint and plaintiffs' appellate briefs discuss myriad provisions of the PERL—we have had some difficulty ascertaining the particular provisions that plaintiffs believe CalPERS breached. That is, although plaintiffs assert that they have a statutory entitlement either to an additional retirement benefit or to a

8

refund of the payments they made to purchase MSC or ARSC, they do not clearly identify the provision (or provisions) they contend entitle them to such additional benefits or to a refund.

Plaintiffs' failure to identify clearly the statutory basis for their claim appears to be an intentional choice, not an oversight. Plaintiffs urge that they have no duty to identify the statute they believe CalPERS violated, and they suggest that the trial court "erred when it placed the burden on [plaintiffs]" to "show statutory authority." Instead, plaintiffs say, the trial court "should have placed the burden on CalPERS to show statutory authority" to support their claims.

Plaintiffs' suggestion that they had no burden to identify the statutory provisions they believe CalPERS violated is fundamentally in error. When a plaintiff pleads a violation of a statutory duty by a public entity, "we think it obvious that a litigant seeking to plead the breach of a mandatory duty must specifically allege the applicable statute or regulation. Only by so doing may the public entity be advised of the factual and legal basis of the claim against it." (*Lehto v. City of Oxnard* (1985) 171 Cal.App.3d 285, 292-293.) If a plaintiff fails to identify the provision of law allegedly violated by the defendant, she "fail[s] to meet her burden of stating and substantiating a legally sufficient claim of unlawfulness." (*Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322, 352.)

For these reasons, it is not enough for plaintiffs to allege the breach of an inchoate statutory duty; instead, they must identify the *particular* statutory provision they contend CalPERS violated. Moreover, as the parties challenging the trial court's determination, it is the plaintiffs' burden "to affirmatively demonstrate error." (E.g., *Consumer Advocacy Group, Inc. v. Kintetsu Enterprises of America* (2007) 150 Cal.App.4th 953, 982.) To do so, plaintiffs must do more than draw our attention to asserted errors in the trial court's reasoning—they must affirmatively demonstrate that they have adequately stated a claim for relief.

With the foregoing in mind, we now turn to the particular statutory section on which plaintiffs' cause of action for breach of statutory duty appears to be based.

9

*B.      The Relevant Statutory Language Does Not Support Plaintiffs'
        Interpretation of It*

Although plaintiffs discuss many provisions of the PERL, they identify only one that they contend requires CalPERS to provide them an ARSC or MSC benefit in addition to their disability allowances.  That provision is section 21420, which states as follows:

"If a member retired for industrial disability has made contributions in respect to service rendered in a category of membership other than the category in which he or she was at the time he or she suffered the disability or incurred the disease causing his or her retirement for industrial disability, in addition to the disability retirement allowance to which he or she is otherwise entitled under this article, *he or she shall receive an annuity purchased with his or her accumulated normal contributions made in respect to service rendered in the other category of membership*."  (Italics added.)

Plaintiffs contend that their purchases of MSC and ARSC were "normal contributions made in respect to service rendered in [another] category of membership" within the meaning of section 21420.  Plaintiffs thus urge that, in addition to their disability benefits, they are entitled to annuities purchased with the sums they contributed to purchase MSC and ARSC.  They say:  "Since military/airtime deposits are made with respect to service prior to and outside the safety job where injured, Section 21420 must (1) exclude military/airtime contributions from funding the IDR under 21418, and (2) provide appellants an additional annuity based on their military/airtime investment."

CalPERS disagrees.  It contends that "normal contributions made in respect to service rendered in [another] category of membership" refers to contributions made while employed by a different CalPERS entity or in a different CalPERS classification, *not* to contributions made in connection with non-CalPERS employment.  Thus, it urges, plaintiffs are not entitled under section 21420 to annuities purchased with MSC or ARSC payments.  We consider these issues below.

10

1.        The Statutory Language

We begin by considering the language of section 21420.  " 'Under well-established rules of statutory construction, we must ascertain the intent of the drafters so as to effectuate the purpose of the law.  (*Preston v. State Bd. of Equalization* (2001) 25 Cal.4th 197, 213.)  Because the statutory language is generally the most reliable indicator of legislative intent, we first examine the words themselves, giving them their usual and ordinary meaning and construing them in context.  (*People v. Lawrence* (2000) 24 Cal.4th 219, 230.)  When statutory language is clear and unambiguous, " 'there is no need for construction and courts should not indulge in it.' "  (*People v. Benson* (1998) 18 Cal.4th 24, 30, quoting *People v. Overstreet* (1986) 42 Cal.3d 891, 895.)'  (*Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 268.)  [Footnote omitted.]"  (*Bernard v. City of Oakland* (2012) 202 Cal.App.4th 1553, 1560-1561.)  The interpretation of a statute presents a question of law, which we review de novo.  (*Burien, LLC v. Wiley* (2014) 230 Cal.App.4th 1039, 1043; *Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2009) 173 Cal.App.4th 13, 21.)  Further, although pension legislation is to be construed liberally, "this rule 'should not blindly be followed so as to eradicate the clear language and purpose of the statute and allow eligibility for those for whom it was obviously not intended.'  (*Neeley v. Board of Retirement* (1974) 36 Cal.App.3d 815, 822.)"  (*City of Oakland v. Public Employees' Retirement System* (2002) 95 Cal.App.4th 29, 39.)

As we have said, section 21420 provides that a disability retiree is entitled to an annuity (in addition to a disability allowance) if he or she has made contributions in respect to service rendered in a "*category of membership*" other than the category in which he or she was serving when he or she became disabled.  Because the statute thus premises the right to an annuity on a member's service in more than one "category of membership," the meaning of this phrase is central to our analysis.

The phrase "category of membership" appears throughout the PERL, but the PERL does not define it.  The statute does, however, define "*member*"—" 'Member' means an employee who has qualified for membership in this system *and* on whose

11

behalf an employer has become obligated to pay contributions." (§ 20370, subd. (a), italics added.)

The statute also defines "member *classification*": " 'Member classification' means either of the following:  [¶]  (a) Miscellaneous member classification, which includes state miscellaneous members, National Guard members, university members, local miscellaneous members, state industrial members, and school members[, or] [¶] (b) Safety member classification, which includes patrol members, state peace officer/firefighter members, state safety members, and local safety members."  (§ 20371.) Subsequent sections of the PERL appear to refer to these classifications as "categor[ies] of membership" and "membership categor[ies]."[5]

Taken together, these sections suggest that a "category of membership" means a job category or classification that has two essential attributes—it (1) qualifies the

---

[5] For example, sections 19816.20, subdivision (a) ["The department shall determine which classes or positions meet the elements of the criteria for the state safety *category of membership* in the Public Employees' Retirement System," italics added], 20046 [" 'Industrial,' in reference to the death or disability of any member of this system who is in a *membership category* under which special benefits are provided by this part because the death or disability is industrial, means disability or death as a result of injury or disease arising out of and in the course of his or her employment as such a member," italics added], 20036 ["In the computation of the disability retirement allowance payable upon the retirement of a member for industrial disability, final compensation shall be determined only with respect to compensation earnable in the *membership category* applicable to the member at the time of the injury or the onset of the disease causing the disability," italics added], 20820 ["Notwithstanding Section 20816, surplus funds credited to the patrol *member category* shall be used to reduce the state employer contribution to this system," italics added], 21353 ["The combined current and prior service pensions for a local miscellaneous member, a school member, a state miscellaneous or state industrial member, or a university member is a pension . . . sufficient, when added to the service retirement annuity . . . to equal the fraction of one-fiftieth of the member's final compensation set forth opposite the member's age at retirement, taken to the preceding completed quarter year, in the following table, multiplied by the number of years of current and prior service except service in a *category of membership* other than that of state or state industrial member, local miscellaneous member, school member, or a university member, or service covered under this First Tier retirement formula, with which the member is entitled to be credited at retirement," italics added].

12

individual for membership in the CalPERS system, *and* (2) obligates an employer to pay contributions on the individual's behalf.  (§ 20370.)  These sections also suggest that "categories of membership" are those specifically described by the statute—i.e., "state miscellaneous members," "National Guard members," "university members," "local miscellaneous members," "state industrial members," "school members," "patrol members," "state peace officer/firefighter members," "state safety members," and "local safety members."

ARSC and MSC do not fall into any of the enumerated statutory categories and do not have either attribute of membership.  As we have described, ARSC is a benefit that was offered to some individuals who were already members of CalPERS, *not* a means by which individuals could qualify for CalPERS membership.  (§ 20909, subds. (a) & (e)(1) [option to purchase ARSC applies only to "members" who are "employed in state service" at the time of the ARSC election], (d) [ARSC "may not be counted to meet the minimum qualifications for service or disability retirement or for health care benefits, or any other benefits based upon years of service credited to the member"].)  Moreover, an employee's purchase of ARSC did not obligate an employer to make CalPERS contributions on the employee's behalf.  To the contrary, section 21052 provides that if an employee elects to purchase ARSC, it is the *employee*, not the employer, who is required to contribute "an amount equal to the increase in employer liability."  (§ 21052.)  ARSC, therefore, is not a "category of membership" because it neither qualified an individual for membership in CalPERS nor obligated an employer to make any contributions on that individual's behalf.

The same is true of MSC.  Nothing in the PERL suggests that service in the United States military entitles an individual to CalPERS membership—to the contrary, the statute is clear it is the individual's subsequent employment with the State of California or a contracting local public agency that creates the right to such membership.  (§§ 21024, 21032.)  Thus, although sections 21024 and 21032 permit members to purchase additional service credit based on prior military service, it is the employment by a state or local agency—*not* the military service—that entitles the individual to CalPERS

13

membership. And, as with ARSC, it is the *employee*, not the employer, who must contribute "an amount equal to the increase in employer liability." (§ 21052.) MSC, therefore, likewise cannot be a "category of membership" because it neither qualifies an individual for membership in CalPERS nor obligates an employer to make any contributions on that individual's behalf.

The statutory language, therefore, does not support the contention that plaintiffs were entitled to non-disability retirement benefits based on their investment in MSC or ARSC.

### 2. Companion Provisions of the PERL

To interpret statutory language, we look not only to the particular provision at issue, but also to "the statutory scheme of which the statute is a part. [Citation.] We look to the entire statutory scheme in interpreting particular provisions 'so that the whole may be harmonized and retain effectiveness.' [Citation.] 'In the end, we " 'must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' [Citation.]" ' [Citation.]" (*People v. Plumlee* (2008) 166 Cal.App.4th 935, 940.)

We find section 21037, added in 2003 by Senate Bill 268, instructive. Section 21037, subdivision (a) provides that if a member has elected to purchase additional service credit through installment payments but retires due to disability while making those payments and the additional service credit does not increase the member's retirement allowance, he or she "may elect to cancel the installments prospectively." The section further provides that "[n]o refund of contributions paid in installments prior to the effective date of the member's election may be payable to a member or retired member as a result of an election made by a member pursuant to this section." (*Ibid.*)

The legislative history of this section explained that "[m]ost members who purchase additional service credit receive larger retirement allowances by doing so. However, some members who retire on disability do not realize any benefit increases from their purchases. Upon approval of their disability retirements, many members begin

14

receiving a fixed percentage of compensation regardless of age, retirement formula, or accrued service credit. In such cases, the additional service credit they purchased does not improve their retirement benefits." (Assem. Com. on Appropriations, Analysis of Sen. Bill No. 268 (2003-2004 Reg. Sess.).) Nonetheless, under existing law, "[m]embers who elect, prior to becoming disabled, to purchase service credit using payment plans will be required to complete the payment plans regardless of the amounts owed or the fact that they will receive no additional benefits from their purchases." (*Ibid*.) Accordingly, the proposed bill "would allow disabled employees and survivors to stop paying for service credit purchases that will not benefit them . . . . Doing so will help to alleviate financial hardship for public employees and their survivors who have undergone tragedies." (*Ibid*.)

Section 21037 does not control the result in the present case because none of the plaintiffs are seeking through this appeal to cancel installment payments prospectively.[6] Nonetheless, it is relevant to our analysis. Section 21037 and its history make clear that the Legislature was aware that CalPERS was construing the statute in precisely the manner plaintiffs now challenge—i.e., to mean that CalPERS members who became disabled after purchasing service credit would not receive any additional retirement benefits as a result of their service credit purchase. The Legislature chose to address this circumstance by permitting members who purchased service credit with installment payments to suspend payments prospectively only—*not* by providing for a refund of payments already made or offering a disabled retiree an annuity purchased with those payments. If the Legislature had intended a more expansive remedy, we presume it would have said so. (See, e.g., *People v. Griffis* (2013) 212 Cal.App.4th 956, 964-965 [where Legislature did not include requirement in statute, court "must presume that its choice in that regard was intentional"].)

---

[6] As we have said, Andert asked for, and received, permission to suspend his installment payments prospectively. His right to do so therefore is not at issue in this appeal.

15

### 3.    CalPERS's Interpretation of Section 21420

We examine finally the administrative interpretation of the PERL by CalPERS. " ' "Although not necessarily controlling . . . the contemporaneous administrative construction of [an] enactment by those charged with its enforcement . . . is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized." ' (*People ex. rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 309, quoting *Coca-Cola Co. v. State Bd. of Equalization* (1945) 25 Cal.2d 918, 921.)" (*Bernard v. City of Oakland* (2012) 202 Cal.App.4th 1553, 1565 (*Bernard*).)

In the present case, plaintiffs concede that CalPERS has consistently interpreted the PERL to mean that if safety workers take industrial disability retirement before the age of 50, they will be paid "only the statutorily-mandated industrial disability retirement (IDR) allowance in the amount of 50% of their last salary"—whether or not they have previously purchased MSC or ARSC. Although CalPERS's construction of the statutory language at issue is not binding, because CalPERS is the administrative body charged with implementing the PERL, its interpretation is entitled to deference. (See *Bernard*, *supra*, 202 Cal.App.4th at p. 1565.)

### C.    In re Marriage of Green *Does Not Compel a Different Result*

Plaintiffs contend that their interpretation of the statute is required by the California Supreme Court's recent decision in *In re Marriage of Green* (2013) 56 Cal.4th 1130 (*Marriage of Green*). *Marriage of Green* discussed the division of CalPERS retirement benefits following a marital dissolution; for the reasons that follow, it is not relevant to our analysis.

In *Marriage of Green*, *supra*, 56 Cal.4th 1130, a firefighter (husband) elected during his marriage to purchase four years of military service credit. Husband had completed all of his military service before he married wife, but purchased the MSC through installment payments made with community funds. When husband and wife separated, more than $11,000 in community funds had been used to purchase the MSC,

16

but the value of the MSC "substantially exceed[ed] the cost of obtaining it." (*Id.* at p. 1132.)

The court concluded that because the husband rendered his military service before the marriage, the four years of MSC, reduced by the amount of the community's contribution to the cost of purchasing it, were the husband's separate property. (*Marriage of Green, supra*, 56 Cal.4th at pp. 1132-1133.) The court explained: "To designate a portion of those four years of credit as community property—as did the Court of Appeal—solely due to the community's contribution towards the required payment gives no weight to husband's premarital service to his country. . . . [¶] . . . [¶] . . . The [purchase of MSC] 'was possible only as consideration for husband's service' in the United States military—service that predated the marriage. [Citation.] The difference in value [between the value of the MSC and the cost of obtaining it] was not due to what the community contributed—part of the installment payments—but to what the husband brought to the community—his military service. For these reasons, the difference in value between the four years' worth of credit and the cost of obtaining it is husband's separate property, subject to reimbursement for the community's contribution to the cost of obtaining the credit." (*Id.* at pp. 1138-1139.)

*Marriage of Green* is not relevant to any of the issues before us. It addressed the characterization of MSC as community or separate property, an issue not presented here, and it did not discuss either industrial disability benefits or section 21420. It therefore does not guide our analysis.

Plaintiffs urge that *Marriage of Green* is relevant because it "denies CalPERS any authority to transform the military/airtime investments into 'service' or 'normal contributions' in the safety job worked at the time of deposit." We do not agree. As we have said, the central issue before us is whether MSC or ARSC is a "category of membership"—a question that *Marriage of Green* neither addresses nor decides. We also reject plaintiffs' suggestion that *Marriage of Green* is relevant because it addresses "the question of when benefits attributable to purchased service credits arise." Again, the issue before us is not *when* credit arises, but whether MSC or ARSC is a "category of

membership," thus triggering the application of section 21420. Because *Marriage of Green* does not address this issue, it cannot guide our analysis.

For all of the reasons discussed above, we conclude that the trial court properly sustained CalPERS's demurrer to the first cause of action for breach of statutory duty.

**II.**

**Breach of Contract (Second Cause of Action)**

Plaintiffs' second cause of action is for breach of contract. Plaintiffs allege that the MSC and ARSC contracts contained a promise by CalPERS "to provide Plaintiffs with increases in their future allowance if Plaintiffs purchased [MSC or ARSC]." Plaintiffs further allege that CalPERS breached those contracts "by failing to pay in full the [MSC or ARSC] benefit, including (i) failing to pay an additional benefit (including the contracted additional [MSC or ARSC] benefit) in the full amount above the disability entitlement and/or (ii) failing to refund the Plaintiffs' lump sum and installments payments, including with interest."

A.      *General Principles of Contract Interpretation at the Demurrer Stage*

"When reviewing whether a plaintiff has properly stated a cause of action for breach of contract, we must determine whether the alleged agreement is 'reasonably susceptible' to the meaning ascribed to it in the complaint. (*Hervey v. Mercury Casualty Co*. (2010) 185 Cal.App.4th 954, 964.) ' "So long as the pleading does not place a clearly erroneous construction upon the provisions of the contract, in passing upon the sufficiency of the complaint, we must accept as correct plaintiff's allegations as to the meaning of the agreement." [Citation.]' (*Aragon-Haas v. Family Security Ins. Services, Inc*. (1991) 231 Cal.App.3d 232, 239 (*Aragon-Haas*); see also *Connell v. Zaid* (1969) 268 Cal.App.2d 788, 795 ['in considering a pleading attacked by general demurrer,' plaintiff's ' "construction of . . . [the contract] should be accepted, if such construction be reasonable" '].)" (*Klein v. Chevron U.S.A., Inc*. (2012) 202 Cal.App.4th 1342, 1384-1385 (*Klein*).) Thus, to survive demurrer, plaintiffs need only set forth a reasonable interpretation of their MSC or ARSC contracts.

"The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties as it existed at the time they entered into the contract. [Citations.] That intent is interpreted according to objective, rather than subjective, criteria. [Citation.] When the contract is clear and explicit, the parties' intent is determined solely by reference to the language of the agreement. (Civ. Code, §§ 1638 ['language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity'], 1639 ['[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible'].) The words are to be understood 'in their ordinary and popular sense.' (Civ. Code, § 1644.)" (*Klein*, *supra*, at p. 1385.)

B.      *The Contract Language*

Although plaintiffs assert that the MSC and ARSC contracts contained CalPERS's promises to increase plaintiffs' future retirement benefits, plaintiffs do not identify the particular language they believe contains such promises. Accordingly, we have independently reviewed the entirety of each of the plaintiffs' contracts.

Each plaintiff entered a slightly different contract, but the language of each contract is substantially similar. Each contract has two parts: (1) a letter from CalPERS to the plaintiff, offering the option to purchase additional service credit, and (2) a letter from the plaintiff to CalPERS, accepting the offer and identifying how the purchase would be made. Marzec's contract is illustrative. His offer letter states as follows:

| "**COST INFORMATION** | |
|---|---|
| "Service Credit Type: | Public Agency Military |
| "Lump Sum Cost: | $23,709.22 |
| "ESTIMATED MONTHLY PENSION INCREASE: | $642.30 if you retire at Age 50* |

"Dear Robert Marzec:

"CalPERS has received confirmation of your intent to purchase your Public Agency Military. Upon further review of your request, it has been determined that you are eligible to purchase this additional service credit. . . . If elected, this service will be credited to your retirement account as shown below:

19

| Employer Name | Retirement Formula | Category | Year(s) of Service Credit |
|---|---|---|---|
| City of Stockton | 3% @ Age 50 (PA Safety) | Local Police | 4.000 |
| **Total Service** | | | 4.000 |

. . .

"**ESTIMATED MONTHLY PENSION INCREASE**

"The estimated monthly pension increase information was calculated using the monthly payrate shown above based upon the highest monthly retirement pension option. This amount is only an **ESTIMATE**; whereas, your actual retirement allowance will be based upon your average payrates.

"For **SAFETY MEMBERS** purchasing additional safety service, keep in mind that the percentage of retirement allowance to which you will be entitled under the Safety formula is limited to a percentage of your average CalPERS compensation at the time of retirement. The estimated monthly pension increase shown above takes your current posted service and benefit cap into consideration.

"*If you are considering a **DISABILITY RETIREMENT**, this additional service credit may not benefit you. Please request a retirement estimate with and without this additional service credit by submitting a CalPERS Retirement Allowance Estimate Request Form (MSD 470) along with a copy of this cover letter. If you need additional information or retirement counseling, please contact CalPERS at (888) 225-7377.

"**Next Step:**

"● If you <u>are not</u> interested in purchasing the additional service credit at this time, no response is needed. You may request to purchase this service credit anytime prior to your retirement date.

"● If you wish to purchase the additional service credit, please complete, sign and return the enclosed Election to Purchase Service Credit form to the address shown above. The Election to Purchase Service Credit form is irrevocable and must be returned within 30 days."

20

Marzec accepted CalPERS's offer to purchase additional service credit by signing and returning an "Election to Purchase Service Credit" form. In relevant part, the election form said:

"You [CalPERS] informed me on September 17, 2004 of my right to elect to contribute and receive service credit for my Public Agency Military from CalPERS. . . . [¶] . . . I hereby elect to purchase and receive additional service credit under the provisions of law and I enclose $23,709.22. . . .

"[¶] . . . [¶]

"**I UNDERSTAND THIS ELECTION IS IRREVOCABLE.**"[7]

C.  *Plaintiffs' Proposed Interpretation of the Contracts Conflicts with Their Plain Meaning*

As we have said, plaintiffs allege that the contracts contained a promise by CalPERS "to provide Plaintiffs with increases in their future allowance if Plaintiffs purchased [MSC or ARSC]." In other words, plaintiffs seem to suggest that CalPERS offered, and plaintiffs accepted, a guaranteed future income stream in the amounts estimated in the offer letters. For example, as to plaintiff Marzec, plaintiffs assert that "CalPERS promised Marzec that he would increase his monthly retirement benefit by 12% by investing funds to obtain credit for 4 years he served in the U.S. Marines."

The contractual language does not support this construction. The offer letters told plaintiffs they were eligible to purchase "*additional service credit*," and that if they elected to do so, "this service will be credited to *your retirement account as shown below*." (Italics added.) Robert Marzec, for example, was advised that his additional service would be credited to his retirement account with the City of Stockton, in the category "local police," subject to the retirement formula "3% @ Age 50 ([Public Agency] Safety)." CalPERS's offer, therefore, was not for a guaranteed future income

---

**7**  Plaintiff Slaughter's offer letter contains somewhat different language with regard to disability retirement benefits: "For **DISABILITY RETIREMENTS OR SAFETY MEMBERS,** if you would like an estimate of the cost benefit of this service credit, please contact CalPERS . . . ."

stream, as plaintiffs seem to suggest, but rather for "additional service credit" associated with a particular employer (City of Stockton), employment category (local police), and retirement formula (3% @ Age 50).

Further, although the offer letters identify an "estimated monthly pension increase" for each plaintiff, they nowhere suggest that a pension increase is promised or guaranteed. To the contrary, the offer letters say that each projected increase "is only an **<u>ESTIMATE</u>**." (Emphasis in original.) In addition, the offer letters state that (1) the projected increases assume retirement "*at Age 50,*" and (2) if plaintiffs take a disability retirement, "*this additional service credit may not benefit you.*" (Italics added.)

Taken together, therefore, this language is not reasonably susceptible to the meaning plaintiffs ascribe to it: That they were "promised" a pension increase if they purchased MSC or ARSC, even if they retired *before* age 50, and even if they took a disability retirement. Accordingly, plaintiffs have not stated a claim for breach of contract, and the demurrer to that cause of action was properly sustained.

## III.

## Rescission (Third Cause of Action)

### A.     *Cause of Action and Demurrer*

Plaintiffs' third cause of action is for rescission. It asserts that plaintiffs are entitled to rescind their MSC/ARSC contracts because CalPERS "induce[d] Plaintiffs to contract . . . on the explicit and implicit promise that their retirement benefits will increase" and "[did] not disclose the risk of loss if the Plaintiff [became] disabled." Plaintiffs assert that through a variety of member publications, CalPERS described MSC and ARSC as a way to "increase" a member's retirement benefit, without disclosing "a risk of loss of [MSC or ARSC] if a Member takes IDR." Further, CalPERS publications "do not disclose that because CalPERS accounts for, characterizes, or otherwise treats the Members' contributions or investment in [MSC or ARSC] as 'normal contributions' associated with the job that the Member holds at the time that he or she purchases the optional benefit, CalPERS can seize or fail to credit the investment, fail to pay an additional annuity, and in effect transfer the investment to the employer." Plaintiffs

22

allege that their consent therefore was given under a mistake of fact or law, or was induced by fraud, and the contracts are unlawful, contrary to public policy, and substantively and procedurally unconscionable. Plaintiffs "offer to restore everything of value which the Plaintiffs have received from CalPERS under the contract upon condition that CalPERS do likewise."

CalPERS's demurrer to the rescission cause of action conceded that a pension system has a duty to " 'fully inform' " a member of retirement options. CalPERS urged, however, that the court should examine the language of CalPERS's disclosures "alleged in or attached to the FAC," and on that basis conclude that CalPERS "fully disclosed to Plaintiffs that they might not benefit from their service credit purchases."

The trial court sustained the demurrer to this cause of action, concluding that "[t]he service credit packets clearly disclosed that 'this additional service credit may not benefit' employees who 'are considering DISABILITY RETIREMENT' rather than service retirement. . . . Although Plaintiffs contend that the loss of their permissive service credits 'violates their reasonable expectations at the time of contracting,' this is not possible because the contract discloses that the credits may be lost upon disability retirement."

### B. Elements of Rescission

" 'A contract is extinguished by its rescission.' (Civ. Code, § 1688.) 'Rescission not only terminates further liability but restores the parties to their former position by requiring each to return whatever he or she received as consideration under the contract, or, where specific restoration cannot be had, its value. [Citations.]' (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 926, p. 1023.) The court does not rescind contracts but only affords relief based on a party-effected rescission. Both the grounds for rescission and the means by which parties may rescind their contract are governed by statute. (See Civ. Code, § 1688 et seq.)" (*Estate of Wong* (2012) 207 Cal.App.4th 366, 382-383.)

The circumstances that entitle a party to rescind are set forth in Civil Code section 1689. Subdivision (b) provides that a contracting party may unilaterally rescind the

23

contract if: (1) "the consent of the party rescinding . . . was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party," (2) "the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds," (3) "the consideration for the obligation of the rescinding party becomes entirely void from any cause," (4) "the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause," (5) "the contract is unlawful for causes which do not appear in its terms or conditions, and the parties are not equally at fault," or (6) "the public interest will be prejudiced by permitting the contract to stand."

### C. *Plaintiffs Have Stated a Cause of Action for Rescission*

Contrary to the trial court, we conclude that plaintiffs have stated a cause of action for rescission. "In considering whether a demurrer should have been sustained, 'we accept as true the well-pleaded facts in the operative complaint.' " (*Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (2014) 59 Cal.4th 568, 571.) Thus, at the demurrer stage plaintiffs were required only to *plead*—not to *prove—*a cause of action for rescission.

The trial court sustained the demurrer because it concluded that the contract language (discussed above) was adequate to put plaintiffs on notice that if they took a disability retirement, they might not benefit from their purchase of MSC or ARSC. Plaintiffs' cause of action for rescission, however, does not depend on the language of the contracts, but on the totality of CalPERS's disclosures to its members. Plaintiffs assert that as a result of those disclosures, their consent to the contracts was induced by mistake of fact and law, fraud, and undue influence, and enforcement of the contracts would be contrary to public policy. Because at the demurrer stage we accept these allegations as true, the demurrer to the third cause of action should have been overruled.

24

## IV.

### Breach of Fiduciary Duty (Fourth Cause of Action)

Plaintiffs' fourth cause of action alleges breach of fiduciary duty. The complaint alleges that CalPERS is a fiduciary and, as such, owed plaintiffs a duty to disclose the potential risks associated with purchasing MSC or ARSC. The complaint further alleges that CalPERS failed adequately to disclose those risks—i.e., that CalPERS's publications and other communications with plaintiffs did not advise them of the risk of forfeiting MSC or ARSC investments if plaintiffs took an industrial disability retirement, rather than a service retirement.

On appeal, plaintiffs contend that the trial court "wrongly made factual determinations on demurrer that the text in CalPERS'[s] military/airtime contracts was adequate to provide notice. If, as the lower court seemed to believe, the appropriate question was whether the contractual disclosures given were adequate to put a reasonable person on notice—even inquiry notice—then their adequacy was a question of fact."

CalPERS concedes that, as a public pension system, it owed plaintiffs fiduciary duties. It urges, however, that we should affirm the order sustaining the demurrer to this cause of action because plaintiffs' breach of fiduciary duty claim "cannot survive the disclosures set out in the exhibits attached to their Complaints."

We conclude that the demurrer to this cause of action should have been overruled. "The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach. (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc*. (1998) 68 Cal.App.4th 445, 483.) Whether a fiduciary duty exists is generally a question of law. (*David Welch Co. v. Erskine & Tulley* (1988) 203 Cal.App.3d 884, 890.) Whether the defendant breached that duty towards the plaintiff *is a question of fact*. (*Ibid*.)" (*Amtower v. Photon Dynamics, Inc*. (2008) 158 Cal.App.4th 1582, 1599, italics added.)

There is no dispute that CalPERS is a fiduciary. As such it is "charged with the fiduciary relationship described in Civil Code section 2228: 'In all matters connected with his trust, a trustee is bound to act in the highest good faith toward his beneficiary,

25

and may not obtain any advantage therein over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind.' " (*Hittle v. Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 392-393.) "This fiduciary relationship is judicially guarded by the application of Civil Code section 2235, which provides that '[a]ll transactions between a trustee and his beneficiary during the existence of the trust, or while the influence acquired by the trustee remains, by which he obtains any advantage from his beneficiary, are presumed to be entered into by the latter without sufficient consideration, and under undue influence.' " (*Id*. at p. 393.)

In the present case, there appear to be factual disputes about what CalPERS disclosed or what representations were made. Indeed, although plaintiffs have attached to their complaint some of the communications between CalPERS and plaintiffs concerning their service credit purchases, there is no suggestion in the complaint that these are *all* of the relevant disclosures on which plaintiffs base their cause of action. Thus, the breach of fiduciary duty claim should not have been disposed of at the demurrer stage.

## V.

### Denial of Equal Protection (Fifth Cause of Action)

*A.     Plaintiffs' Equal Protection Claim*

The fifth cause of action alleges denial of equal protection of the law. Plaintiffs assert that disabled retirees who purchased MSC or ARSC are treated differently than disabled retirees who did not: "[A]ppellants are treated unequally solely because they purchased military/airtime while other members did not. All safety members are entitled to a statutory IDR benefit of 50% of their highest compensation, at no cost to themselves . . . . But appellants are charged *significantly more* for their IDR benefits compared to those who never [bought] military/airtime solely because CalPERS characterizes the investment as time 'in the safety job', transfers it to the employers, and thus decreases employer liability but *increases* appellants' costs and reduces their net IDR proceeds."

Plaintiffs give the following example: "Suppose twin brothers start as firefighters on the same date, earn the same pay and promotions, and make identical member contributions. Both are disabled at age 45 in the same fire and both retire on IDR.

26

Suppose further that one bought 4 years of prior military time for $80,000 before being disabled while the other did not. Each will receive an identical IDR allowance of 50% of their final compensation. But the brother who bought $80,000 of military time will be discriminated against by receiving nothing for that additional investment, in effect starting $80,000 in the hole compared to his twin."

B.      *The Requirement of Equal Protection:  Equal Treatment of Persons Who Are Similarly Situated*

" 'The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally.  [Citation.] Accordingly, " '[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' " [Citation.]  "This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' " [Citation.]' (*People v. Brown* (2012) 54 Cal.4th 314, 328; accord, *People v. Wutzke* (2002) 28 Cal.4th 923, 943.)" (*People v. Losa* (2014) 232 Cal.App.4th 789, 792; see also *Grossmont Union High School Dist. v. State Dept. of Education* (2008) 169 Cal.App.4th 869, 892 ["The essence of an equal protection claim is that two groups, similarly situated with respect to the law in question, are treated differently."].)

C.      *The Complaint Fails to State an Equal Protection Claim*

We agree with the trial court that the complaint fails to state an equal protection claim.  The complaint assumes that two disability retirees—one who purchased MSC/ARSC, and one who did not—are similarly situated if they served in the same position, for an equivalent number of years, and retired at the same age.  By this assumption plaintiffs err, because the disability retiree who purchased MSC/ARSC has more years of retirement credit, as the following example demonstrates:

27

|  | Years of service | Years of purchased service credit | TOTAL SERVICE CREDIT (YEARS) |
|---|---|---|---|
| Member A | 20 | 4 | 24 |
| Member B | 20 | 0 | 20 |

In the above example, although neither member gets a service retirement benefit if he retires before age 50, Member A "loses" more years of service credit because he has accumulated more. This is not a violation of equal protection because the two members are not similarly situated: Member A has accumulated 24 years of service credit, while Member B has accumulated only 20.

A more appropriate comparison for equal protection purposes is of two disability retirees who have accumulated the same amount of service credit. For example:

|  | Years of service | Years of purchased service credit | TOTAL SERVICE CREDIT (YEARS) |
|---|---|---|---|
| Member A | 16 | 4 | 20 |
| Member B | 20 | 0 | 20 |

In this example, if Member A and Member B both take disability retirement at age 45, both "lose" 20 years of service credit. Member A, who has purchased some of his retirement credit, is treated no differently than Member B, who has earned all of his. There is no equal protection violation.[8]

---

[8] Plaintiffs suggest that in this example, Member A "loses" more than Member B because Member A has been charged more than Member B for his or her service credits. Not so: Both members have purchased their service credits through a combination of monetary contributions and service.

# VI.

## Denial of Due Process (Sixth Cause of Action)

The sixth cause of action alleges denial of due process. Plaintiffs assert that CalPERS has denied them procedural due process by "seizing the [MSC or ARSC] benefits and investment without first giving Plaintiffs some adequate legal process." Plaintiffs also assert that CalPERS has denied them "substantive due process and the right to be free from arbitrary or unreasonable government action."

On appeal, plaintiffs cite no legal support for the assertion that CalPERS's action constitutes a violation of procedural or substantive due process. The argument therefore is forfeited. (E.g., *Saltonstall v. City of Sacramento* (2014) 231 Cal.App.4th 837, 858, fn. 10 [appellate argument forfeited "for failure to make anything more than 'only passing arguments, unsupported with citation to authority or evidence' "].)

# VII.

## Unconstitutional Impairment of Contract (Tenth Cause of Action)

The tenth cause of action alleges unconstitutional impairment of contract. It asserts: "Government Code sections 20909, 21006-21008, 21013, 21020.5, 21023.5, 21024, 21025.5, 21027 and 21029-21031 impaired [plaintiffs'] right to their 50% IDR allowance by causing the money to be described as 'normal contributions' and then us[ing] those funds to offset Plaintiffs' disability allowance. [Plaintiffs'] IDR entitlement vested at the time of their first employment in the 'safety' category. CalPERS'[s] practices impaired [plaintiffs'] right to both their IDR allowances and their additional optional benefits. (California Constitution, Article I, Section 9.) The contract clauses of the federal and state Constitutions limit the power of a state to modify its own contracts with other parties, as well as contracts between other parties."

We agree with the trial court that plaintiffs have not stated a claim for unconstitutional impairment of contract. Plaintiffs' contention here is analogous to the plaintiff's in *Miller v. State of California* (1977) 18 Cal.3d 808 (*Miller*), in which a long-time state employee urged that the state unconstitutionally impaired his contractual pension rights by reducing his mandatory retirement age from 70 to 67. The trial court

found that the change in law did not impair any of plaintiff's rights, and the Supreme Court affirmed. In so concluding, the Supreme Court noted that "it is well established that 'public employment gives rise to certain obligations which are protected by the contract clause of the Constitution,' " and thus that " '[s]ince a pension right is "an integral portion of contemplated compensation" [citation] it cannot be destroyed, once it has vested, without impairing a contractual obligation.' " (*Id.* at p. 815.) Further, "the right to pension benefits vests upon the acceptance of employment [citations], even though the right to immediate payment of a full pension may not mature until certain conditions are satisfied." (*Ibid.*) Nonetheless, "[a]lthough vested prior to the time when the obligation to pay matures, pension rights are not immutable. For example, the government entity providing the pension may make reasonable modifications and changes in the pension system. This flexibility is necessary 'to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system and carry out its beneficent policy.' " (*Id.* at p. 816.)

Applying these principles, the *Miller* court held that the change in plaintiff's pension rights was not an unconstitutional impairment of contract. It explained: "[U]pon acceptance of public employment plaintiff acquired a vested right to a pension based on the system then in effect. That system allowed him to earn successively higher levels of benefits based on his years of service and his highest average salary during three consecutive years of employment. Under that system, he could have achieved maximum benefits had he worked until age 70. Although his right to a pension based on this system was vested, plaintiff was not assured of receiving maximum pension benefits. His right to receive such benefits was subject to conditions and contingencies; specifically, that he remain in state employment until age 70. Plaintiff failed to satisfy that condition since he was lawfully placed on retirement at age 67. Thus, his right to a maximum pension based on retirement at age 70 never matured." (*Miller*, *supra*, 18 Cal.3d. at p. 817.)

The present case is analogous. Although plaintiffs' industrial disability and pension rights vested when plaintiffs accepted public employment, their right to receive either industrial disability benefits or service retirement benefits was subject to

30

"conditions and contingencies." Specifically, to be entitled to an industrial disability benefit, plaintiffs had to suffer a work-related disability; alternatively, to be entitled to a service retirement benefit, plaintiffs had to remain in their local safety positions until at least age 50. Because all plaintiffs retired before age 50, their rights to service retirement benefits never matured. As a matter of law, therefore, the denial of service retirement benefits was not an unconstitutional impairment of contract. (See *Miller*, *supra*, 18 Cal.3d at p. 817 [" 'The fact that a pension right is vested will not, of course, prevent its loss upon the occurrence of a condition subsequent such as lawful termination of employment before completion of the period of service designated in the pension plan.' "].)

## VIII.

## Remaining Causes of Action

Plaintiffs make no contentions on appeal with regard to their seventh, eighth, ninth, eleventh, and twelfth causes of action, for equitable relief, declaratory relief, accounting, estoppel, and other relief. Therefore, we do not address them.

**[[ Begin nonpublished portion ]]**

**[[ IX.**

## Class Definition/Statute of Limitations

Because the causes of action for breach of fiduciary duty and rescission survive demurrer, we address the additional issue of CalPERS's demurrer to the class definition.

*A.    Background*

1.    Class Definition

The complaint defines the putative plaintiff class as follows: "All persons employed as safety Members or in other positions covered for the potentiality of industrial disability retirement who have purchased, or in the future will purchase, 'Military Service Credit' or 'Military Time,' 'Additional Retirement Service Credit' or other present value service credit options from the California Public Employees' Retirement System (CalPERS) and either overpaid for their benefits or did not receive all of the benefits they are entitled to.

31

"The above defined class includes those who have paid monies that have been included in the purchase price or cost 'of Military Service Credit' or 'Military Time,' 'Additional Retirement Service Credit' or other present value service credit options which are (i) the lawful responsibility of Plaintiffs' employers and/or the retirement system, (ii) in addition to the amount necessary to fund the additional service or annuity benefit, (iii) costs unrelated to the Member's increased service or annuity benefit; or (iv) which Plaintiffs cannot be lawfully required to pay.

"The above defined class includes those who have suffered, or in the future will suffer, an industrial disability retirement (IDR), and now receive or will receive retirement allowances, IDR allowances, other benefits, or a combination thereof, that are or will be such that Plaintiffs will not receive all of the benefits that they are entitled to."

### 2. Delayed Accrual

The complaint alleges that the statute of limitations did not begin to run on any of plaintiffs' claims until at least October 15, 2010. The complaint asserts: "CalPERS'[s] practices of accounting for and characterizing [MSC and ARSC] as associated with the safety job held by the Member at the time of purchase remained hidden until CalPERS disclosed those practices no earlier than October 15, 2010, in its first pleadings and disclosures in response to a different class action Complaint in the case of *David Yost, et al. v. CalPERS,* Los Angeles Superior Court Case No. BC444842 (hereafter '*Yost*'). Therefore, the causes of action of Plaintiffs and all members of the proposed class did not accrue until October 15, 2010, at the very earliest. [¶] . . . [¶] . . . Plaintiffs allege that the earliest that anyone could have learned of CalPERS's improper accountings, errors, and practices related to contributions arose from CalPERS'[s] first responsive pleadings and disclosures that it filed in response to the Complaint in *Yost*. More specifically, Plaintiffs allege that the earliest that CalPERS disclosed that it characterizes the monies paid by Plaintiffs for the purchase of [MSC/ARSC] as contributions in the current job ('made in respect to service rendered in a category of membership' in which the Member was employed at the time of purchase), rather tha[n] correctly characterizing the monies as contributions made in respect to service *outside* of the job in which the Member was

32

disabled, was in connection with CalPERS'[s] *Demurrer* filed in *Yost* on October 15, 2010."

The complaint also alleges that Marzec and Healy submitted timely government claims pursuant to the Government Claims Act, section 900 et seq., that the government claims were filed "individually and in a representational capacity for all others in the class identified herein," and that "a single class representative may comply with the purported presentation requirements to maintain a class action."

### 3. CalPERS's Demurrer to the Class Definition

CalPERS demurred to the class definition as "overly broad" based on CalPERS's claim that the statute of limitations had run as to some putative plaintiffs' claims and that a government claim had not been timely filed as to those putative plaintiffs. CalPERS implicitly conceded that a claim by a class representative for himself and others similarly situated could be found sufficient to support an action on behalf of the others in the class without the necessity for each individual to file a claim. (See *California Restaurant Management Systems v. City of San Diego* (2011) 195 Cal.App.4th 1581, 1592.) Therefore, because Marzec presented a claim in connection with some of the pension issues raised in this action, CalPERS conceded that claim "was sufficient to preserve the rights of putative class members whose claims had accrued within one year beforehand— on or after March 24, 2010." CalPERS urged, however, that any putative class members whose claims accrued *before* March 24, 2010, were not within Marzec's government claim and thus could not be part of this action.

CalPERS asserted, moreover, that the delayed discovery rule did not apply to persons who had already taken disability retirement and begun receiving benefits payments. It said: "Given that Plaintiffs expected CalPERS to provide them additional amounts over and above their 50% IDR allowances, Plaintiffs had every reason to suspect something was wrong when they first saw they were receiving no more than 50% of their pay. Expecting to be paid a certain amount and receiving less is an obvious wrong— providing a factual basis for all the causes of action's elements."

33

The trial court adopted CalPERS's analysis and sustained the demurrer to the class definition. The court explained that the plaintiffs contended that the claims of all class members accrued within less than a year of the filing of the present action because "none of them discovered or could have discovered CalPERS['s] improper characterization of their investments in [MSC/ARSC] until CalPERS disclosed this fact in the course of the *Yost v. CalPERS* lawsuit [BC444842]." The court disagreed: "Many allegations in the current complaint are identical to *Yost*. Plaintiffs were aware of CalPERS'[s] calculation methods before the *Yost* complaint was filed and the demurrer heard. Moreover, according to the FAC, Plaintiffs should have been aware of their injury as of the date they received their first IDR checks."

> B.   *The Trial Court's Determinations Concerning Class Suitability Were Premature*

> 1.   Claims Presentation Requirement and Delayed Accrual

The Tort Claims Act (Gov. Code, § 900 et seq.) "establishes certain conditions precedent to the filing of a lawsuit against a public entity." (*State of California v. Superior Court* (2004) 32 Cal.4th 1234, 1237.) "[A]ll claims for money or damages against the state" that meet the following criteria must be presented to the Victim Compensation and Government Claims Board (VCGCB): "(1) For which no appropriation has been made or for which no fund is available but the settlement of which has been provided for by statute or constitutional provision. [¶] (2) For which the appropriation made or fund designated is exhausted. [¶] (3) For money or damages on express contract, or for an injury for which the state is liable. [¶] (4) For which settlement is not otherwise provided for by statute or constitutional provision." (§ 905.2, subd. (b).)

"Claims for personal injury must be presented not later than six months after the accrual of the cause of action, and claims relating to any other cause of action must be filed within one year of the accrual of the cause of action. (§ 911.2, subd. (a).) Timely claim presentation is not merely a procedural requirement, but is a condition precedent to the claimant's ability to maintain an action against the public entity. [Citation.] 'Only

34

after the public entity's board has acted upon or is deemed to have rejected the claim may the injured person bring a lawsuit alleging a cause of action . . . against the public entity.' [Citation.]" (*California Restaurant Management Systems v. City of San Diego*, *supra*, 195 Cal.App.4th at p. 1591.)

"The accrual date for presenting a government tort claim is determined by the rules applicable to determining when any ordinary cause of action accrues. (§ 901.) That date may be postponed under the delayed discovery doctrine. (*K.J.* [*v. Arcadia Unified School Dist.* (2009)] 172 Cal.App.4th [1229], 1233.) Under this doctrine, a cause of action does not accrue until the plaintiff discovers, or has reason to discover, the cause of action. (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807.) A plaintiff has reason to discover a cause of action when he or she has reason to at least suspect a factual basis for its elements. Suspicion of one or more of the elements, coupled with knowledge of any remaining elements, will generally trigger the applicable limitations period. (*Ibid.*)" (*S.M. v. Los Angeles Unified School Dist*. (2010) 184 Cal.App.4th 712, 717.)

2.    Plaintiffs' Allegations of Delayed Accrual Are Sufficient to Survive Demurrer

On appeal, plaintiffs contend that "all similarly situated persons are entitled to relief, regardless of how long ago they invested in military/airtime, received ADR, or retired," because as a class, the plaintiffs "could not detect or comprehend CalPERS'[s] breach or [their] resulting injuries." Indeed, plaintiffs suggest, they "did not discover (and were not even put on inquiry notice) until CalPERS indirectly revealed its statutorily-unsupported accounting relating to IDR in another lawsuit [footnote omitted] shortly before *Marzec* and *Andert* were filed. [Citation.] [Plaintiffs] exercised reasonable diligence after discovery and timely filed government claims and suit."

We conclude that it was premature for the trial court to make determinations pertaining to class suitability on demurrer. " '[B]ecause the sustaining of demurrers without leave to amend represents the earliest possible determination of the propriety of class action litigation, it should be looked upon with disfavor. This is not to say that sustaining demurrers to class action complaints without leave to amend is always

35

improper. Conceptually, we suppose that any "class action" complaint at the pleading stage is possible of being amended so as to plead a class action which will survive demurrer, but we also recognize that certain factual situations may negate such a possibility. It is in such factual situations that sustaining demurrers without leave to amend is proper. However, absent such strong factual showings, all that is normally required for a complaint to survive demurrers to the propriety of class litigation is that the complaint allege facts that tend to show: (1) an ascertainable class of plaintiffs, and (2) questions of law and fact which are common to the class. If the complaint is allowed to survive the demurrer, then the judge may proceed with the suit, deferring his determination of the propriety of class action until a time when he may better make the decision.' (*Beckstead v. Superior Court* [(1971)] 21 Cal.App.3d [780], 783-784, paragraphing added, fn. omitted.)" (*Prince v. CLS Transportation, Inc.* (2004) 118 Cal.App.4th 1320, 1326.)

In the present case, the statute of limitations issues and related class definition appear to turn on a variety of factual issues that were not properly before the trial court on a demurrer. Because we conclude that the plaintiffs adequately pled delayed discovery of their causes of action, we do not now reach the parties' contentions regarding class suitability, the statute of limitations, and accrual of the plaintiffs' claims. CalPERS is free to raise these arguments and others if plaintiffs move to certify a class at a later stage.**]]**

**[[ End nonpublished portion ]]**

36

## DISPOSITION

In the *Marzec* action, the judgment is reversed as to the third and fourth causes of action and the class definition, and is otherwise affirmed. In the *Andert* action, judgment on the pleadings is reversed as to the third and fourth causes of action and the class definition, and is otherwise affirmed. Each party shall bear its own costs on appeal.

**CERTIFIED FOR PARTIAL PUBLICATION**


EDMON, P. J.


We concur:



KITCHING, J.



ALDRICH, J.