Filed 4/29/21  Marzec v. Cal. Public Employees' Retirement System CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ROBERT MARZEC et al., | B294383 |
| Plaintiffs and Appellants, | Los Angeles County Super. Ct. Nos. BC461887, BC480695 |
| v. | |
| CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County, Maren E. Nelson, Judge. Affirmed.

Law Offices of John Michael Jensen and John Michael Jensen for Plaintiffs and Appellants.

Steptoe & Johnson and Jason Levin for Defendants and Respondents.

# INTRODUCTION

This appeal concerns "the calculation of retirement benefits under the Public Employees' Retirement Law (PERL), Government Code section 20000 et seq.[1] Plaintiffs are former police officers and firefighters employed by local public agencies that provide employee retirement benefits through California's Public Employees' Retirement System (CalPERS). In order to enhance their service retirement benefits, plaintiffs purchased additional years of service credit through one of several optional programs offered by CalPERS. Subsequently, each plaintiff was disabled on the job and took an industrial disability retirement before reaching service retirement age. As a result, CalPERS pays each plaintiff a monthly disability retirement allowance of 50 percent of his or her final compensation. CalPERS does not, however, pay plaintiffs any additional allowance as a result of their purchase of additional years of service credit." (*Marzec v. Public Employees' Retirement System* (2015) 236 Cal.App.4th 889, 895 (*Marzec I*).)

Plaintiffs seek to rescind their purchase contracts on the ground that CalPERS's written disclosures did not adequately apprise them of the risk that their purchased service credit would not increase their retirement benefits should they become disabled and argue that the trial court erred by denying their motion to certify a class on that basis. We conclude substantial evidence supports the court's conclusion that plaintiffs did not establish superiority of class treatment. We therefore affirm.

---

[1] All undesignated statutory references are to the Government Code.

# BACKGROUND

[Begin quoted material from *Marzec I, supra*, 236 Cal.App.4th at pp. 896–900.][2]

## 1.    CalPERS Retirement Benefits

CalPERS is a unit of the Government Operations Agency responsible for administering the retirement systems for the State of California and "contracting agencies"—local public agencies that have "elected to have all or part of [their] employees become members of this system and that ha[ve] contracted with [CalPERS] for that purpose." (See §§ 20001, 20002, 20004, 20022, 20028.) All of the plaintiffs in this action worked as police officers or firefighters for local public agencies that enrolled their employees in CalPERS. (§ 20420.)

The PERL authorizes retirement benefits to CalPERS members. As relevant here, the PERL provides safety members employed by local public agencies ("local safety members") with two distinct kinds of retirement benefits:

(1) *Service retirement benefit*: If a member retires at or after age 50, the member is eligible for a service pension to "equal 3 percent of his or her final compensation at retirement, multiplied by the number of years of patrol service or local safety

---

[2] Sections 1 through 6 of the background in this opinion quote sections I through IV of the background in *Marzec I, supra*, 236 Cal.App.4th at pp. 896–900. However, we have changed the roman numerals and letters of the *Marzec I* headings to sequential numbers and have changed the *Marzec I* heading italics to bold. Added or deleted material appears in [[double brackets]]. All other alterations were made in *Marzec I*.

service subject to this section with which he or she is credited at retirement." (§ 21362.2.)

(2) *Industrial disability retirement benefit*: If a member retires before age 50 because of an industrial (job-related) disability, he or she "shall receive a disability retirement allowance of 50 percent of his or her final compensation." (§ 21413.)[3] Alternatively, the disabled member may "waive[ ] the right to retire for disability and elect[ ] to withdraw contributions or to permit contributions to remain in the fund." (§ 21153.)

## 2. Right to Purchase Additional Service Credit

At all relevant times, [[any]] CalPERS member who had served with the United States Armed Forces [[was]] permitted to receive credit for such service "in addition to his or her current and prior service credit" by "contribut[ing] in a lump sum or by installment payments … an amount equal to … the contributions he or she would have made to this system for the period for which current service credit is granted." (§§ 21032, 21033; see §§ 21020, 21024.) Such purchased service credit is referred to as "military service credit" (MSC).

Between 2003 and 2012, CalPERS members with at least five years of credited state service were permitted "to make contributions … and receive not less than one year, nor more than five years, in one-year increments, of additional retirement

---

[3] Under section 21413, a member who retires for industrial disability after age 50 (i.e., at the age at which the member qualifies for service retirement) receives either a 50 percent disability retirement allowance or his or her service retirement allowance, whichever is greater. Because all plaintiffs retired before age 50, they were not eligible for service retirement benefits.

4

service credit in the retirement system." (§ 20909, subd. (a).) To receive such credit, members were required to contribute "an amount equal to the increase in employer liability, using the payrate and other factors affecting liability on the date of the request for costing of the service credit." (§ 21052.) This purchased service credit is referred to as "additional retirement service credit" (ARSC) or "airtime."

3.  **Plaintiffs' Purchases of Additional Service Credit and Subsequent Industrial Disability Retirements**

Each of the plaintiffs purchased additional service credit and subsequently took industrial disability retirement before age 50, as follows:

Plaintiff Robert Marzec worked as a police officer for the Stockton Police Department for approximately 17 years. In 2004, he elected to purchase four years of MSC based on his previous service with the United States Marines by making a lump sum payment of $23,709. In August 2010, after suffering a job-related injury, Marzec took an industrial disability retirement and began receiving industrial retirement benefits of 50 percent of his final compensation.

Plaintiff Rachel Healy worked as a police officer for the Stockton Police Department for approximately nine years. In 2005, she elected to purchase five years of ARSC by making a lump sum payment of $31,360, and rolling over an additional $46,000 from a deferred compensation account. After she suffered a job-related injury, Healy took an industrial retirement effective September 2009 and began receiving industrial retirement benefits of 50 percent of her final compensation.

Plaintiff Benjamin Esparza worked as a firefighter for the Monrovia Fire Department for approximately 25 years. In 2005,

5

he elected to purchase five years of ARSC by rolling over $76,436 from his deferred compensation plan. He was injured on the job and took an industrial disability retirement in August 2009. At that time, he began receiving industrial retirement benefits of 50 percent of his final compensation.

Plaintiff Jeffrey Andert worked as a police officer for the Alhambra Police Department for six years. In 2004, he elected to purchase four years of MSC through biweekly installment payments of $269.90, for a total of $77,190 in principal and interest. Andert was injured on the job in 2006, and in 2007 he asked for, and received, permission to suspend his installment payments. Andert took an industrial disability retirement in May 2008 and began receiving industrial retirement benefits of 50 percent of his final compensation. In August 2008, he permanently suspended all further installment payments.

Plaintiff Neil MacLaren was a firefighter for the Roseville Fire Department for more than 21 years. In 2005, MacLaren elected to purchase two years of ARSC by rolling over $29,977 from his retirement account. MacLaren was injured on the job and took an industrial disability retirement in 2009, at which time he began receiving industrial disability benefits of 50 percent of his final compensation.

Plaintiff Randy Slaughter was a police officer for the Newport Beach Police Department for approximately 17 years. In 2001, Slaughter elected to purchase four years of MSC by making monthly installment payments of $6,977 and a lump sum payment of $44,652. Slaughter took an industrial disability retirement in 2004, at which time he began receiving industrial retirement benefits of 50 percent of his final compensation.

[[Plaintiff Henry Brown was a corrections officer for the Department of Corrections and Rehabilitation for approximately 13 years. In 2006, he elected to purchase three years of MSC through monthly installment payments of $413.53, for a total of $59,848.32 in principal and interest. Brown also elected to purchase five years of ARSC through monthly installment payments of $688.56, for a total of $99,152.64 in principal and interest. Brown was injured on the job in 2012, and took an industrial disability retirement in July 2013, at which time he began receiving industrial retirement benefits of 50 percent of his final compensation. In October 2013, he elected to cancel all further installment payments.]]

Because each of the plaintiffs retired before age 50, none received a service retirement benefit, and none received any additional retirement benefits as a result of his or her purchase of MSC or ARSC.

### 4. The Present Actions

Marzec, Healy, and Esparza filed an action on May 18, 2011 (the *Marzec* action), and filed the [[…]] first amended class action complaint on February 28, 2012. Andert, MacLaren, and Slaughter filed a similar class action complaint (the *Andert* action) on March 12, 2012. Both actions asserted that plaintiffs were entitled, in addition to their industrial disability retirement allowances (sometimes referred to as "IDR"), to additional retirement benefits associated with their purchases of MSC or ARSC. The actions asserted that neither the PERL nor plaintiffs' purchase contracts authorized CalPERS to "seize" plaintiffs' MSC/ARSC investments as a condition of receiving disability benefits, that CalPERS did not adequately advise plaintiffs of this risk of seizure before they invested in MSC or ARSC, and

7

that through its administration of disability and MSC/ARSC benefits, CalPERS treated plaintiffs differently than other similarly situated CalPERS members.

Plaintiffs [[alleged]] that CalPERS's failure to pay additional retirement benefits or to return the MSC or ARSC investments gave rise to 12 causes of action: (1) breach of statutory duties; (2) breach of contract; (3) rescission/restitution; (4) breach of fiduciary duties; (5) denial of equal protection; (6) denial of due process; (7) equitable relief; (8) declaratory relief; (9) accounting; (10) constitutional impairment of contract; (11) estoppel; and (12) other relief, including attorney fees.

## 5. CalPERS's Demurrer in the *Marzec* Action

CalPERS demurred to the first amended complaint in the *Marzec* action. In a detailed written opinion, the trial court sustained the demurrer without leave to amend. Although the court said that plaintiffs' situation is "certainly sympathetic," it concluded that none of plaintiffs' causes of action stated a claim for relief. The court entered a judgment of dismissal, and plaintiffs timely appealed.

## 6. CalPERS's Motion for Judgment on the Pleadings in the *Andert* Action

CalPERS filed a motion for judgment on the pleadings in the *Andert* action. The motion asserted that plaintiffs' claims were functionally identical to those in the *Marzec* case, and therefore the court should grant judgment on the pleadings for the same reasons it sustained the demurrer in *Marzec*.

The trial court granted the motion for judgment on the pleadings. Plaintiffs timely appealed, and this court ordered the *Marzec* and *Andert* appeals consolidated.

[End quoted material from *Marzec I, supra,* 236 Cal.App.4th at pp. 896–900.]

7.    ***Marzec I***

On appeal, a different panel of this court affirmed in part. We concluded that "neither the PERL nor plaintiffs' contracts entitle plaintiffs to the additional retirement benefits they seek, and thus the [first] cause[ ] of action for breach of statutory duty and [the second cause of action for] breach of contract fail as a matter of law. Plaintiffs' causes of action for constitutional torts also fail[ed] because, as a matter of law, CalPERS's interpretation of the applicable statutory provisions [did] not deny plaintiffs due process or equal protection of law," as alleged in the fifth and sixth causes of action, and did not "effect an unconstitutional impairment of contract," as alleged in the 10th cause of action. (*Marzec I, supra,* 236 Cal.App.4th at p. 896; see *id.* at pp. 901–912, 916–920.) Because plaintiffs did not challenge the trial court's ruling as to the seventh, eighth, ninth, 11th, or 12th causes of action, *Marzec I* did not address them.[4] (*Id.* at p. 920.)

Nevertheless, *Marzec I* reversed as to the third cause of action, for rescission, and the fourth cause of action, for breach of fiduciary duty. Plaintiffs alleged that CalPERS failed to disclose that they could lose the value of their purchased service credit if they became disabled at work—a disclosure that, they alleged, CalPERS, as a fiduciary, was required to make. (*Marzec I, supra,* 236 Cal.App.4th at pp. 913–916.)

---

[4] Those causes of action were for equitable relief, declaratory relief, accounting, estoppel, and other relief, including attorney's fees.

9

As to the third cause of action, the opinion explained, the "trial court sustained the demurrer because it concluded that the contract language … was adequate to put plaintiffs on notice that if they took a disability retirement, they might not benefit from their purchase of" service credit. (*Marzec I*, *supra*, 236 Cal.App.4th at p. 914.) But plaintiffs' cause of action for rescission did not "depend on the language of the contracts, *but on the totality of CalPERS's disclosures to its members*. Plaintiffs assert[ed] that as a result of those disclosures, their consent to the contracts was induced by mistake of fact and law, fraud, and undue influence, and enforcement of the contracts would be contrary to public policy." (*Id*. at pp. 914–915, italics added.) Because the court was required to accept those allegations as true, it should have overruled the demurrer as to this cause of action. Similarly, as to the fourth cause of action, *Marzec I* held that "there appear to be factual disputes about what CalPERS disclosed or what representations were made. … Thus, the breach of fiduciary duty claim should not have been disposed of at the demurrer stage." (*Id*. at p. 916.)

## 8. Third Amended Complaint and Demurrer

Upon remand, the *Marzec* and *Andert* actions were consolidated, and plaintiffs filed a second amended class-action complaint, which alleged causes of action for (1) breach of fiduciary duties, (2) rescission, and (3) other relief, including attorney's fees. After additional discovery, plaintiffs filed the operative third amended class-action complaint, which added Henry Brown as a plaintiff.

CalPERS demurred to the first cause of action, for breach of fiduciary duty, on statutory immunity grounds, an issue *Marzec I* did not consider. CalPERS also argued that plaintiffs, in

the third amended complaint, had reframed this cause of action to encompass their previously-dismissed claim that CalPERS had breached its statutory duties. (See *Marzec I, supra*, 236 Cal.App.4th at p. 909 [trial court properly sustained demurrer to cause of action for breach of statutory duty].) As such, the claim was barred by law of the case.

In a memorandum decision, the trial court sustained the demurrer to the first cause of action without leave to amend.[5]

9.      **Class Certification Proceedings**

Plaintiffs moved for class certification on the rescission cause of action. The court denied the motion by detailed written opinion.

First, the court held that the class was not ascertainable by objective standards. Plaintiffs had sought to certify a class for a period "from 1991 onward," but those dates conflicted with the third amended complaint, which recognized that the class period could only reach back to March 24, 2010—one year from the date of the first Government Claims Act filing. Not only did the class period extend too far into the past, the court noted, but it also extended into the future. The court also found it difficult to determine how to identify who purchased service credit "pursuant to CalPERS standardized forms and publications."

---

[5] Plaintiffs attempt to challenge that ruling—at great length—in this appeal by bootstrapping arguments about the demurrer into their claims concerning the later class certification ruling. Because the demurrer order is not appealable, we do not address those arguments. (See *In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 760–761 [order sustaining demurrer without leave to amend as to individual *and* class claims not immediately appealable as to the class claims under the "death knell" doctrine].)

Second, the court found the class was sufficiently numerous.

Third, the court held that there was not a well-defined community of interest, primarily because individual questions predominated over common questions. In particular, notwithstanding CalPERS's status as plaintiffs' fiduciary, individual issues predominated because CalPERS had the right to rebut the presumption of reliance and had demonstrated how it might do so. In addition, the court was concerned that in light of the number of people who spoke to CalPERS about their retirement, oral disclosures varied across the class. The court also noted that there would be individual inquiries concerning CalPERS's statute of limitations defense. And, although the proposed class representatives had typical claims, and some might be adequate to represent the class, the court had concerns about the adequacy of class counsel.

Finally, the court held that plaintiffs had not demonstrated superiority of class treatment. The individual issues rendered the case unmanageable, and plaintiffs had presented no reasonable trial plan to address that issue. Further, because the proposed class members had spent an average of $83,000 on service credit, they had a strong incentive to pursue their claims individually.[6]

Plaintiffs filed a timely notice of appeal.

---

[6] This number appears to have been based on CalPERS's estimate of the named-plaintiffs' average investment. Plaintiffs estimate that the average member of the proposed class "lost" approximately $41,459 plus interest.

## CONTENTIONS

Plaintiffs argue that the court's conclusions were not supported by substantial evidence, that the court erred by failing to resolve the merits of their materiality and reliance claims, and that the court erred by ignoring their alternative theories of rescission.

## DISCUSSION

### 1. Legal Principles and Standard of Review

"The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives. [Citations.] 'In turn, the "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' [Citation.]" (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).)

"The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.] The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' [Citation.] … 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class

13

will be certified even if the members must individually prove their damages.' [Citations.]" (*Brinker, supra,* 53 Cal.4th at pp. 1021–1022.)

The presence of individual issues does not render class certification inappropriate, therefore, as long as those issues can be managed fairly and efficiently. (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 28–29 (*Duran*).) But manageability is critical. Thus, to establish that class treatment is superior to the alternatives, the party seeking class certification must submit a trial plan that adequately demonstrates how individual issues will be handled. (*Id.* at pp. 31–32.)

"On review of a class certification order, an appellate court's inquiry is narrowly circumscribed. 'The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion: "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests upon improper criteria, or (3) it rests on erroneous legal assumptions. [Citations.]' [Citations.]" (*Brinker*, *supra*, 53 Cal.4th at p. 1022.) "Accordingly, we must examine the trial court's reasons for denying class certification. 'Any valid pertinent reason stated will be sufficient to uphold the order.' [Citation.]" (*Linder v. Thrifty Oil Co*. (2000) 23 Cal.4th 429, 436.)

## 2. Theories of Rescission

A party may rescind a contract and seek restitution if consent to the contract was given based on mistake of law or fact;

14

if consent was obtained through fraud, undue influence, duress, or menace; if there is a failure of consideration; or if the contract is unconscionable or violates public policy. (Civ. Code, § 1689, subd. (b).) The remedy of rescission extinguishes a contract and restores the parties to their former positions by requiring them to return whatever consideration they have received. (Civ. Code, §§ 1688, 1691, subd. (b).) Here, plaintiffs alleged rescission under all of these theories. We conclude, however, that only their claim of constructive fraud is properly before us.

### 2.1. Forfeiture

In *Marzec I*, we cautioned plaintiffs that "as the parties challenging the trial court's determination, it is plaintiffs' burden 'to affirmatively demonstrate error.' [Citation.] To do so, plaintiffs must do more than draw our attention to asserted errors in the trial court's reasoning … ." (*Marzec I*, *supra*, 236 Cal.App.4th at p. 902; see also *id*. at p. 901 ["Plaintiffs' failure to identify clearly the statutory basis for their claim appears to be an intentional choice, not an oversight."].) In this appeal, although plaintiffs complain that both the trial court and respondents failed to address their theories of rescission based on mistake, undue influence, duress, menace, unconscionability, violation of public policy, and frustration of purpose, they do not develop those claims.

For example, plaintiffs spend just one sentence arguing that the court erred by failing to address their claim that a rescission class should have been certified under a theory of lack of consent: "A class for rescission based on lack of consent should have been certified. (Civ. Code, § 1578; *Harris v. Rudin, Richman & Appel* (2002) 95 Cal.App.4th 1332, 1339.)" Their citations do not help matters. *Harris* involves a client seeking to rescind a

contract with his lawyer based on an amendment to the Probate Code. The pin cite lists the elements of mistake of law, which is defined in Civil Code section 1578.

Plaintiffs' argument about frustration of purpose is even more opaque: "CalPERS frustrates reasonable expectations of increased retirement allowances. (*Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga* (2009) 175 Cal.App.4th 1306, 1337.)" The import of this contention and the relevance of *Habitat Trust* to this lawsuit are unclear.[7]

As such, plaintiffs have forfeited those arguments on appeal, and we decline to address them. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [plaintiff's failure to develop claim with reasoned legal argument and supporting authority forfeits the issue].)

### 2.2. *Marzec I* bars plaintiffs' claim that there was a failure of consideration.

We also decline to address plaintiffs' contention that the court should have certified a class for rescission based on a failure of consideration. (Civ. Code, § 1689, subd. (b)(2), (4), (5).) Plaintiffs argue that they "paid for (estimated) increased allowances [citation], but received no increases, due to the fault of CalPERS. [Citation.]" But we rejected that argument in *Marzec I*. As we explained then, the "contractual language does not support this construction. The offer letters told plaintiffs they were eligible to purchase 'additional service credit,' and that if they elected to do so, 'this service will be credited to your retirement

---

[7] Not only did plaintiffs fail to develop an appellate argument about frustration of purpose, they also failed to allege that theory in the third amended complaint.

account as shown below … .' … CalPERS's offer, therefore, was not for a guaranteed future income stream, as plaintiffs seem to suggest, but rather for 'additional service credit' associated with a particular employer …, employment category …, and retirement formula … ." (*Marzec I*, *supra*, 236 Cal.App.4th at p. 912, italics omitted.) Put another way, plaintiffs contracted for additional service credit, not increases. We are bound by that interpretation in this appeal. (See *Kowis v. Howard* (1992) 3 Cal.4th 888 [law of the case].)[8]

Accordingly, we turn to plaintiffs' claim that a class should have been certified under a constructive fraud theory of rescission. (Civ. Code, § 1573.)

### 2.3. Constructive Fraud

"There is no dispute that CalPERS is a fiduciary. As such it is 'charged with the fiduciary relationship described in Civil Code section 2228: "In all matters connected with his trust, a trustee is bound to act in the highest good faith toward his beneficiary, and may not obtain any advantage therein over the latter by the slightest misrepresentation, concealment, threat, or adverse pressure of any kind." ' [Citation.]" (*Marzec I*, *supra*, 236 Cal.App.4th at p. 915–916.) "A fiduciary must tell its principal of all information it possesses that is material to the principal's interests. [Citations.] A fiduciary's failure to share material

---

[8] To the extent plaintiffs argue that consideration failed because they did not receive the service credit they were entitled to, they have forfeited that claim by failing to develop it. (See *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 [absence of cogent legal argument or citation to authority forfeits the contention; "[w]e are not bound to develop appellants' arguments for them"].) And, in any event, it appears that plaintiffs also failed to raise that issue below.

information with the principal is constructive fraud, a term of art obviating actual fraudulent intent." (*Michel v. Moore & Associates, Inc.* (2007) 156 Cal.App.4th 756, 762.)

Here, as the court below explained, plaintiffs' "theory of recovery is that the written disclosures made at the time of contracting did not adequately disclose the risk of loss and that they would not have purchased the credits had they been so informed, entitling them to rescind." To prove constructive fraud, plaintiffs must establish that CalPERS misled them by failing to provide them with complete and accurate information about a material fact, and the failure caused them harm. (Civ. Code, § 1573; see CACI No. 4111.)

### 3. Individual Issues Concerning Reliance and Materiality

As the court distilled it, plaintiffs' "essential allegation is that [they] were entitled to and are presumed to have or did rely on CalPERS'[s] written representations, and that the representations did not adequately disclose the risk that investment money could be lost or transferred if they were injured." They "argue that because they have a fiduciary relationship with CalPERS[,] they may show reliance by the use of an evidentiary 'presumption.' Alternatively, they argue that reliance may be shown by the use of a statistical sample."

Reliance is a necessary element of a claim for constructive fraud. (*Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498, 516, fn. 14.) In the class action context, an inference of reliance arises as to the entire class "when the same material misrepresentations have actually been communicated to each member of a class." (*Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1095, italics omitted.) One predicate requirement to drawing this inference is a showing that the representation made was

18

material. (*Ibid*.; see also *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 977 ["a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material"]; *Occidental Land, Inc. v. Superior Court of Orange County* (1976) 18 Cal.3d 355, 363 [inference arises "if a material false representation was made to persons whose acts thereafter were consistent with reliance upon the representation"]; *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 814 [inference arises "if the trial court finds material misrepresentations were made to the class members"].)

" 'A misrepresentation of fact is material if it induced the plaintiff to alter his position to his detriment. [Citation.] Stated in terms of reliance, materiality means that without the misrepresentation, the plaintiff would not have acted as he did. [Citation.]' " (*Lacher v. Superior Court* (1991) 230 Cal.App.3d 1038, 1049.) In a typical fraud case, the plaintiff must show that he " ' "actually relied upon the misrepresentation; i.e., that the representation was 'an immediate cause of his conduct which alters his legal relations,' and that without such representation, 'he would not, in all reasonable probability, have entered into the contract or other transaction.' ..." [Citation.]' [Citation.]" (*Ibid*.)

Because constructive fraud arises from a fiduciary relationship, however, there is a presumption of reasonable reliance. (*Edmunds v. Valley Circle Estates* (1993) 16 Cal.App.4th 1290, 1301–1302.) Nevertheless, a defendant may rebut the presumption by proving with substantial evidence that the plaintiff did *not* reasonably rely on the misleading information or omission because the misrepresentation was immaterial—that is, consent would have been given and the contract entered into

19

notwithstanding the misrepresentation. (*Ibid.*; *Tyler v. Children's Home Society* (1994) 29 Cal.App.4th 511, 529.)

For purposes of its analysis, the court in this case assumed that CalPERS had a fiduciary relationship with the proposed class members. It agreed with plaintiffs that a rebuttable presumption of reliance arises when a fiduciary makes a material misrepresentation. And it appeared to accept that such a presumption exists in this case: "when a [safety member] is deciding to purchase additional credits, the member is entitled to an adequate disclosure of the risk."

But the court also acknowledged that CalPERS was "entitled to rebut the presumption by showing Plaintiffs and the class of persons they seek to represent would have acted no differently had they known all the facts. The theory of this litigation is that class members acted as they did because they were not provided full disclosure of the risk. Consequently, if it can be shown that some class members would have purchased credits even if adequately informed of the risk, reliance cannot be established on a class-wide basis."

CalPERS Deputy Chief Actuary Randall J. Dziubek offered several reasons safety members might want to purchase service credit notwithstanding the risk of loss should they become disabled. First, CalPERS offered an excellent investment return. The price of service credit depended on each member's expected age at retirement and life expectancy. CalPERS would then set a price providing a fixed rate of return. The current rate of return is 7.0 percent. Between 2012 and 2016, however, it was 7.5 percent, and before that, it was 7.75 percent. By contrast, since 2004, Treasury rates have varied between 1.5 percent and 5.25 percent.

Second, people who purchased service credit tended to retire earlier than their non-purchasing coworkers. Indeed, at least two named plaintiffs in this case bought credit for that very reason. Third, it was a terrific deal. Although service-credit purchases were intended to be cost-neutral, an internal review of the program found that because people who purchased service credit retired earlier than expected, safety members paid on average 19 percent less for service credit than was needed to achieve cost neutrality.

When weighed against these benefits, service members may have also chosen to invest because they underestimated the subjective risk that they would become disabled before age 50. Indeed, several named plaintiffs noted that they saw the contract language warning that the purchase might not benefit them if they took disability retirement but didn't think the warning applied to them because they weren't planning to become disabled. Others couldn't say for sure whether they would have chosen to purchase service credit if the risks had been clearer.

CalPERS was entitled to present individual evidence of these issues to rebut the presumption of reliance. Ultimately, however, we need not determine whether those individual questions predominate over common questions in this case because plaintiffs failed to meet their burden of demonstrating how they would manage those issues, and therefore, failed to establish that class treatment would be the superior method of resolving their dispute.

## 4. Plaintiffs failed to establish the superiority of a class action.

"Because a class should not be certified unless 'substantial benefits accrue both to litigants and the courts' [citation], the

21

question arises as to whether a class action would be superior to individual lawsuits [citations]." (*Basurco v. 21st Century Insurance Co.* (2003) 108 Cal.App.4th 110, 120.) That is, "even if questions of law or fact predominate, the lack of superiority provides an alternative ground to deny class certification." (*Ibid.*)

In considering whether to certify a class, manageability of individual issues is just as important as the existence of common questions.[9] (*Duran, supra,* 59 Cal.4th at p. 29; *id.* at pp. 32–33 ["While common issues among class members" may be "sufficient to satisfy the predominance prong for certification, the trial court" must also "determine that these individual issues [can] be effectively managed in the ensuing litigation."].) Critically, a class-action plaintiff cannot foreclose litigation of relevant defenses even if they turn on individual questions. (*Id.* at p. 34.) Here, as discussed, CalPERS indicated its intent to rebut the presumption of reliance by presenting evidence that any omissions or misrepresentations were immaterial to individual class members. That is, CalPERS would show that safety members would have purchased service credit even if they had known about the risk of losing their money if they became disabled. Accordingly, to establish that a class action would be superior to individual lawsuits, plaintiffs needed to craft a trial plan that explained how they would manage those questions.

Instead, plaintiffs' trial plan wishes the problem away by insisting that CalPERS *has no* legitimate individual arguments. For example: "Many or all of CalPERS'[s] asserted defenses and

---

[9] Plaintiffs spend only a paragraph challenging the court's manageability finding. We nevertheless exercise our discretion to address this issue.

22

assertions of individualized matter are without legal or factual merit, and should be closely scrutinized and briefed. CalPERS'[s] potential claims of individualized issues such as differences in each Plaintiff's subjective intent, subjective understanding, prior injuries, or work situation are irrelevant under law … ." Later, plaintiffs write that each of CalPERS's "representations was a material term that was not adequately disclosed. Although if there is no presumption of reliance, it could be that, some think that one or more of those terms was implied or disclosed. However, CalPERS'[s] failure to disclose any one of those material terms is sufficient to breach its fiduciary duty, cause legal mistake, no consent, and be sufficient grounds for rescission, [s]o there is no concern over the gradations of liability." Overall, the trial plan demonstrates little understanding about the issues likely to be disputed and provides no explanation for how those issues will be handled.[10]

---

[10] The plan acknowledges only a "small number of potential individualized issues and defenses that are potentially not resolved by the legal issues, for example if a class member did not sign standardized forms … ." Then, 43 pages later, plaintiffs again point to a form-signing problem as the sole legitimate individual issue when they write, "Other than if a class member did not sign the standardized forms, which would be CalPERS'[s] defense to prove from its own records as an exception to its standard practice, there are few or no relevant factual issues related to liability or CalPERS'[s] defenses that would be individualized prior to or at the time of contracting. *See Duran*. If CalPERS can prove that CalPERS allowed an individual to invest in the investment without signing a standardized form contract, then those defenses and individuals can be dealt with separately. If CalPERS comes forward with a list of individuals that did not sign the contracts, then these issues can be heard separately, on an individual or subclass basis after trial on the common issues."

Plaintiffs offered that if the court were to find "there is no presumption or reliance that controls," they "reserve the rights to admit statistical evidence, a statistical analysis and expert testimony, and challenge CalPERS'[s] expert testimony into the record, and therefore have offered this Trial Plan." *Duran* cautions, however, that "when a trial plan incorporates representative testimony and random sampling, a preliminary assessment should be done to determine the level of variability in the class." (*Duran*, *supra*, 59 Cal.4th at p. 33; see also *id*. at p. 31 ["a statistical plan for managing individual issues must be conducted with sufficient rigor"].) Here, however, plaintiffs' trial plan includes no expert declarations or statistical data. It provides no information about how sampling would occur or what a sufficient sample population would be.[11] Instead, it insists—at length but with no supporting detail—that its analysis would satisfy *Duran*.

Moreover, as the court noted, many class members had received oral disclosures to supplement what they received in writing. "Plaintiffs suggest that sampling would be adequate to establish what employees were told in these conversations and to establish their reliance (or lack thereof). Plaintiffs tender no expert opinion in this regard. Their counsel's opinion that such a sample could be created is without any foundation. [Citation.] Further, the statistical plan appears to be nothing more than a series of individual questions to individual class members." (See *Duran*, *supra*, 59 Cal.4th at p. 40 ["If a defense depends upon

---

[11] The trial plan simply asserts that the "overall population … is fairly uniform and standardized regarding the characteristics that are relevant for purposes of determining any relevant factual issues in this case."

24

questions individual to each class member, the statistical model must be designed to accommodate these case-specific deviations."].)

Even without accounting for defense evidence or individual questions, however, the trial plan failed to accomplish the basics. As the court explained, plaintiffs' "trial plan, which is over 50 pages in length, does not present a clear game plan. Rather, like the [class certification] motion itself, it contains many legal arguments but little in the way of factual analysis as to how the various claims can be proved on a class-wide basis." For example, the plan states that "Plaintiffs will prove that Plaintiffs' apparent consent was not real as it was obtained through duress, menace, fraud, undue influence, or mistake." Later, plaintiffs assert that they will "prove delayed accrual and discovery across the class from reliance, failure to disclose, mistake, omission, misrepresentation, adversity, rescission, *et al* in a fiduciary context." In the paragraphs and pages that follow, however, they never explain how they plan to achieve this.

In sum, the court in this case found that the individual issues "in this case render it unmanageable. No reasoned trial plan to handle this problem is proposed to cure this." Substantial evidence supports this conclusion and, therefore, plaintiffs did not show that a class action would be superior to individual lawsuits.

5.    **The court was not required to resolve the merits of materiality.**

Plaintiffs argue at length that the court's order denying class certification is fundamentally flawed because the court did not first resolve the merits of the materiality issue. We disagree.

"Presented with a class certification motion, a trial court must examine the plaintiff's theory of recovery, assess the nature of the legal and factual disputes likely to be presented, and decide whether individual or common issues predominate. To the extent the propriety of certification depends upon disputed threshold legal or factual questions, a court may, and indeed must, resolve them." (*Brinker*, *supra*, 53 Cal.4th at p. 1025.) But "a court generally should eschew resolution of such issues unless necessary." (*Ibid.*)

In particular, "whether an element may be established collectively or only individually, plaintiff by plaintiff, can turn on the precise nature of the element and require resolution of disputed legal or factual issues affecting the merits." (*Brinker*, *supra*, 53 Cal.4th at p. 1024.) But such inquiries are circumscribed—and if possible, resolution of the merits of a claim should be postponed until after class certification is decided, "with the court assuming for purposes of the certification motion that any claims have merit." (*Id.* at p. 1023.)

As discussed above, the court here assumed that that plaintiffs benefitted from presumptions of materiality and reliance in this case. The court was not required to determine whether CalPERS would be successful in rebutting those presumptions—only that CalPERS had demonstrated how it might do so.[12]

---

[12] To the extent plaintiffs' argument is that CalPERS is not *entitled* to rebut these presumptions as a legal matter, they have presented no authority to support that contention, and our research has revealed none.

## DISPOSITION

The order denying class certification is affirmed. CalPERS shall recover its costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


LAVIN, Acting P.J.

WE CONCUR:


EGERTON, J.


ADAMS, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27